COALITION FOR EDUCATION IN DIS-
TRICT ONE et al., Plaintiffs,

v.

The BOARD OF ELECTIONS OF the
CITY OF NEW YORK et al.,
Defendants.

No. 73 Civ. 3983.

United States District Court,
S. D. New York.

Jan. 11, 1974.

Frederick E. Sherman, Charles E. Williams, III, New York City, Arnold

Rothbaum, Ira Bezoza, Brooklyn, N. Y., for plaintiffs.

Norman Redlich, Corp. Counsel, New York City, by Irwin L. Herzog, Doron Gopstein, New York City, for the defendants New York City Bd. of Elections, New York City Bd. of Ed., and Community School Bd., Dist. One.

Joseph Slavin, Brooklyn, for defendant Kings County Democratic Committee.

## OPINION

STEWART, District Judge:

The plaintiffs are predominantly black, Puerto Rican[1] and Chinese residents of Community School District One in Manhattan ("District One") and the Coalition for Education in District One, an unincorporated association of parents, teachers and community residents. They bring this action challenging the legality of the May 1, 1973 election of members to the District One school board, claiming that numerous actions and omissions of the defendants resulted in the election being held in a racially discriminatory manner. The defendants are principally the members, employees and agents of the New York City Board of Education and Board of Elections.[2] The plaintiffs seek a judgment declaring the May 1 election invalid and ordering a new school board election in District One.[3]

The defendants, while admitting that certain irregularities occurred in the May 1 election, contend that positive steps were taken to encourage minority participation in this election; that there were no more irregularities than caused by usual human fallibility in all elections; that the irregularities were in no way discriminatory; and that, even if some discrimination was shown, it was not sufficient to set aside an otherwise valid election.

This matter originally reached the hearing stage on a motion for a preliminary injunction to enjoin certain actions of the allegedly illegally elected school board. At the conclusion of an extensive evidentiary hearing, which continued for eight days and at which numerous exhibits were introduced, the parties stipulated, and it was so ordered, that the hearing should constitute a full hearing on the merits of the plaintiffs' claim as to the election.

We are therefore faced with two questions:

1) Was the May 1 election conducted generally in a manner which either demonstrated a racially discriminatory purpose by the defendants and their agents or which resulted in a racially discriminatory impact on the voting rights of black, Puerto Rican and Chinese voters and any potential voters,[4] and therefore illegal?

2) If so, is a new election a necessary and proper remedy?

Prior to the May 1 election, a group representing Puerto Rican and Chinese voters city-wide, some of whom are also plaintiffs in this case, brought suit to secure their rights to multilingual school board elections. Lopez v. Dinkins, 73 Civ. 695 (S.D.N.Y.1973). Various orders were stipulated to regarding a multilingual pre-election nomination process.

---

1. This term encompasses all persons of Hispanic heritage, the large majority of whom are Puerto Rican in District One.

2. The remaining defendants are the various New York City Democratic and Republican county committees and their respective chairmen, and six members of the current District One school board.

3. Plaintiffs' complaint also challenges the selection and performance of election inspectors who serve during *each* election *throughout* New York City. The District One controversy, originally brought on by an Order to Show Cause for a Preliminary Injunction, became a separate matter, and is the only issue currently before this Court for decision. The city-wide challenge to the system of selecting election inspectors remains pending. The class action aspects of the lawsuit have also yet to be determined, and need not be at this time.

4. Black, Puerto Rican and Chinese voters and potential voters are also collectively referred to hereinafter as "minority voters".

On March 21, 1973, this Court issued an Order concerning the May 1 election requiring the defendants, who are essentially the same as in this case, to:

1. prepare ballots with instructions in Spanish as well as English;

2. prepare and distribute sample ballot placards with instructions in Spanish and Chinese as well as English;

3. prepare and distribute separate instruction sheets in Spanish and Chinese, as well as English;

4. provide at least one person who was bilingual in English and Spanish or English and Chinese to act as an interpreter at each school polling site where there were, respectively, more than 5% Puerto Rican or more than 5% Chinese students enrolled.[5]

5. inform Spanish-speaking and Chinese-speaking voters of all forms of bilingual assistance available.

This Order, which was reached through negotiation by the parties, was not appealed.

Plaintiffs in this case contend that neither the letter nor the spirit of the Lopez Order was complied with on May 1, 1973, and that the failures to comply were among the numerous failures by the defendants which resulted in a discriminatory election.

Defendants contend that in addition to complying fully, they went beyond the letter of the Lopez Order, to which they had essentially stipulated, and provided language assistance in other languages in addition to Spanish and Chinese.

In September, 1973 another group allegedly representing Puerto Rican voters city-wide came before this Court to secure bilingual assistance for the general elections of November 6, 1973 and all future elections. Torres v. Sachs, 73 Civ. 3921 (S.D.N.Y.1973). Concluding that "[t]he conduct of an election in English only violates plaintiffs' rights under the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. and the Voting Rights Amendments of 1970, 42 U.S.C. § 1973aa et seq., which enforce the Fourteenth Amendment to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983," this Court signed an Order on September 26, 1973 granting plaintiffs a preliminary injunction guaranteeing for the November 6 election to all Puerto Rican voters in New York City essentially the same language assistance which Puerto Ricans and Chinese had been granted for the school board elections earlier this year. The provision for interpreters' assistance at the polls was spelled out in greater detail than in the Lopez Order:

Said translators [Spanish and English speaking persons] shall be permitted to approach Spanish speaking voters for the purpose of offering assistance and shall be permitted to go behind the guard-rails for purposes of providing assistance.

This Order which was also reached through negotiation by the parties, was not appealed. The question of bilingual assistance for all future elections is pending before this Court on the Torres plaintiffs' motion for summary judgment.[6]

---

5. This Court rejected a proposal by one of the defendants in Lopez to amend the March 21 Order to include a provision that the person offering bilingual assistance at the polling site do so only "upon request".

6. To complete the picture as to related litigation: this Court's September 26 Order apparently prompted the United States Department of Justice to move to reopen a declaratory judgment exempting Bronx, Kings and New York (Manhattan) counties from Section 4(a) of the Voting Rights Act of 1965, as amended in 1970, 42 U.S.C. § 1973b(a), (b), alleging that the "English only requirement" was a "test or device" within Section 4(c) of the Act, 42 U.S.C. § 1973b(c), which "has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color of Spanish speaking citizens living in New York City". This motion to reopen was granted by a three-judge court of the District of Columbia Circuit on November 5, 1973. On January 4, 1974, that Court ruled from the bench that the three New York City counties were not exempt from Section 4(a) of the Voting Rights Act.

*Findings of Fact*

I. Background: May 1 election.

Pursuant to New York Education Law § 2590–c, each of the thirty-two community school districts in New York City is governed by an elected board. Elections were held throughout the city for positions on each of the boards for the first time in 1970, and then again on May 1, 1973.

Procedures for New York City school board elections in general, and the May 1 school board election in particular, are different from regular New York City election procedures in at least three substantial ways.

First, in school board elections, there are two categories of eligible voters: all regularly registered voters, plus parents of public school children (hereinafter referred to as "parent voters").[7] Parents who are not regularly registered voters must register specially, and regularly registered voters living outside a particular school district, but having children in that district's schools, must register specially as parent voters in order to vote in the school board election for the district in which their children attend school. Since each voter is entitled to only one vote, a voter who is regularly registered and lives within the boundaries of one school district, but who has a child attending public school in another district, may elect to vote in one, but only one, of the two districts.

Second, while regular elections are conducted using voter registration "buff cards" which enable inspectors to compare the signature of the voter at the poll with the signature of the person who originally registered, the May 1 school board election was not conducted in this fashion. For some reason which does not appear on the record, computer print-out sheets bearing the names and addresses of the voters were, in the case of regularly registered voters, used in place of buff cards.[8] Thus, on May 1, inspectors were not able to authenticate regularly registered voters' signatures at the polls. Also for an unexplained reason, buff cards similar to those used in regular elections *were* used on May 1 for parent voters.

Finally, the school board elections, unlike others, are conducted under a system of proportional representation. While this system is meant to increase minority representation while guaranteeing majority control, it has at least two other ramifications for this case. First, it complicates the balloting process. Voters may vote for one or more candidates up to the number of vacant seats on the board, but in some manner they must express a preference. The instructions call for the placing of numbers next to the name of each candidate voted for in order of preference, e. g., one for the voter's first preference, two for his next preference, and so on. Thus, for example, a ballot containing "X" marks next

A related matter, Velez v. Cunningham, 73 Civ. 2666, a class action seeking general relief with regard to election inspectors in New York City similar to that sought by the plaintiffs at bar (see note 3 *supra*) has also been filed with this Court.

7. Such parents must be citizens of New York State, but not necessarily of the United States, over eighteen years of age, and New York City residents for at least thirty days. New York Education Law § 2590–c(3) (McKinney's Consol.Laws, c. 16 1973–74 Supp.).

8. A twelfth-hour ruling by the New York Court of Appeals on April 27, 1973 held that a state statute required that buff cards be used in the school board elections. Rai-

mundi v. Board of Elections, 32 N.Y.2d 768, 344 N.Y.S.2d 957, 298 N.E.2d 119 (1973). However, on the day before the elections, the Board of Elections was authorized by legislative amendment to go forward as planned with the use of the computer print-outs. Laws of New York 1973, Ch. 236 (adopted and effective April 30, 1973).

Contrary to defendants' contention, the New York Supreme Court did *not* subsequently rule the use of the computer print-outs to be constitutional in Aponte v. Board of Elections (Sup.Ct. Kings County, Special Term, Part I, May 16, 1973). The court found that the plaintiffs lacked standing to sue, and concluded: " . . . the merits of the constitutional issue cannot be reviewed (citations omitted)."

to the names of each of nine candidates (the number of seats vacant on the District One board) would be an invalid ballot, since the voter failed to show a preference. While this system is not so complex as to be unexplainable under ordinary circumstances, in an election where there are an unusual number of uninitiated voters, many of whom speak, read or understand little or no English, this balloting process is quite likely to create confusion, if instructions are not clear, consistent, and multilingual.

Secondly, the tabulation of ballots under a proportional representation system makes it impossible for the Court to determine the number of additional or amended ballots necessary to change the outcome of the election. Ballots are counted in random order, and each voter's first preference is noted. On the basis of this first count, candidates having received enough votes mathematically to guarantee their victory are declared victorious. (The number of votes so required is referred to as "quota".) In District One on May 1, a candidate receiving 1260 first place votes on the first count was deemed to have reached quota and therefore to have won. After a candidate reaches quota on this first count, any subsequent ballots which indicated a first preference for that candidate are redistributed and counted for the voter's second indicated preference. Exactly which ballots are so redistributed is determined by the random order of count, determined by lot. Next, the candidate with the lowest number of first-place votes is deemed to have lost, and ballots on which he is the first preference are redistributed to the second indicated preference on each ballot. This process is repeated until such time as there remain only as many candidates as seats to be won.[9]

Thus, while the difference between the candidates who finished ninth and tenth in the balloting, after all of the redistribution, was 266 votes,[10] it is impossible to know the significance of that figure. It is quite possible that a change in the outcome of the election would have resulted if, after the first count, an additional or different one or two candidates had reached quota, and thus had their surplus ballots redistributed to the second preference indicated. On this theory, somewhere between 108 or 143 changed or additional ballots could very well have changed the outcome.[11] It is most likely that the exact figure which indicates the number of changed or amended ballots necessary to change the outcome of the election lies somewhere between 108 and 266. All this Court can do at this time, in determining whether the outcome of the elections could possibly have been affected by discrimination, is to indicate the order of magnitude with which we are concerned.

II. Background: District One.

District One is located on the Lower East Side of Manhattan, bounded on the North by East 14th Street, on the East and South by the East River, and on the West by Fourth Avenue and the Bowery in the northern half and Clinton and Rutgers Streets and Pike Slip in the southern half.

Census figures indicate that approximately 41.4% of the residents of District One are black or Puerto Rican, but that this percentage is not uniform in each neighborhood of the District. Some neighborhoods are virtually all

---

9. For a more detailed explanation, see Campbell v. Bd. of Education, 310 F.Supp. 94, 98–99 (E.D.N.Y.1970), a case in which this tabulation system itself was challenged.

10. Candidate Beck finished tenth, and was thus the losing candidate who received the most votes. At the last count, he had 994 votes, or 266 votes short of quota.

11. Candidates L. Brown and Hoggard finished 108 and 143 votes from quota, respectively, on the first count. As a result, although they were elected after redistribution, ballots on which they were the first preference were not redistributed.

white, such as the Grand Street area which contains several middle-income co-operatives, and the middle-income housing development along First Avenue between East 3rd and East 6th Streets. Other areas are virtually all black or Puerto Rican, in particular the area east of Avenue B, from Houston to East 14th Streets. Because of this disparity in the racial composition of neighborhoods, some of the thirty-three polling sites used on May 1 serviced predominantly white voters, while other sites serviced predominantly black or Puerto Rican voters. A table listing the District One polling sites on May 1. and providing census data on the racial makeup of the election districts located at each site as well as other data discussed below is set forth in an appendix to this opinion.[12]

The school population in District One has a much higher proportion of minority members than the resident population. Over 92% of the children attending District One schools are black, Puerto Rican, Oriental or American Indian.[13] Because the proportion of minority members in District One's school population is much higher than the proportion of minority members in District One's resident population,[14] the proportion of minority members among District One's parent voters is significantly higher than the proportion of minority members among District One's regularly registered voters.[15] Many of the Puerto Rican and Chinese residents of District One speak, read or understand little or no English.

The May 1 school board elections in District One spurred a great deal of community interest, concern and participation. The rate of pre-election registration, including parent registration, was very high and the proportion of voter turnout on election day was more than twice the city-wide average.

Although slates of candidates were not officially sanctioned nor slate affiliations listed on the ballots, there were in fact two slates, one comprised of eight, the other of nine candidates, plus three candidates without slate affiliation, running for the nine seats on the District One board.[16] One slate, sponsored by the plaintiff, Coalition for Education in District One, was comprised of the incumbent school board, most of whom were Puerto Rican, black and Chinese, and was recognized in the community to represent the policies of the incumbent board concerning bilingual education and parent and community involvement in the schools.[17] The opposition slate was sponsored by a group called the Committee for Effective Education and supported, financially and otherwise, by the United Federation of Teachers. It consisted of eight white candidates, and one black. The election was bitterly

12. This appendix is plaintiffs' Exhibit 14, which is a composite of plaintiffs' Exhibits 16, 16A, 16B and 16C. The facts contained therein were not disputed by the defendants.

13. See plaintiffs' Exhibit 1:

| | # | % |
|---|---|---|
| Black | 2,538 | 14.8 |
| Puerto Rican (all Hispanics) | 12,393 | 72.4 |
| Oriental | 926 | 5.4 |
| American Indian | 16 | 0.1 |
| Total Minority Student Population | 15,873 | 92.7 |

Total Student Population 17,120

14. As the resident population figures do not contain breakdowns for Orientals or American Indians, for comparison purposes, these two groups should be discounted from the school population figures. The percentage of blacks and Puerto Ricans in the school population is still twice as great as the percentage of blacks and Puerto Ricans in the resident population, 87.2% compared to 41.-4%.

15. This is corroborated in part by the fact that almost 80% of the parent voters registered in District One had Spanish or Chinese surnames. Of course, a check of the surnames of registered parent voters could not reveal the number of additional black parent voters.

16. This fact is clearly indicated by campaign organization and literature as well as by the common perception of community residents reflected in the testimony.

17. This was reflected in the testimony of William Carlotti, a witness we find totally forthright and credible.

contested between these two groups, and this struggle contained serious racial and ethnic overtones.

Prior to May 1, all parties also had a high degree of awareness of, and concern over, potential difficulties in conducting the school board elections in a manner which allowed full participation of minority voters, especially newly-enfranchised parent voters. In addition to the lawsuits discussed above, meetings were held between various interested community groups and officials of the Board of Elections at which numerous proposals were made. In response to the various expressions of concern, the Board of Elections took certain steps which went beyond those compelled by the *Lopez* Order in some respects in an attempt to allow full minority participation in the May 1 election. For example, instructions were prepared in several languages in addition to those compelled by the Order. The election was publicized through the "ethnic media". A special deputy registrar system expanded opportunities for the registration of parent voters.

## III. Conduct of the May 1 Election.

Despite these efforts, there was tremendous confusion and a large incidence of irregularities at certain polling places in District One on election day. The totality of the evidence adduced at trial compels this Court to find that the May 1, 1973 District One school board election was conducted in a manner which had a substantial discriminatory impact on black, Puerto Rican and Chinese voters and potential voters. This racially discriminatory impact resulted from essentially two types of conduct: a) that which was a departure from statutes or established administrative procedures and had a discriminatory impact on minority voters and b) conduct which was not on its face illegal or irregular, but which had a discriminatory impact on minority voters, and which was not explained or justified by the defendants.

In addition, there were incidents of intentional racial discrimination by employees or agents of the defendants. These incidents merely compounded the racially discriminatory impact which resulted from the general practices and procedures employed in the election.

Generally, the racially discriminatory impact was demonstrated at the hearing by evidence of irregular practices at polling sites servicing predominantly minority voters, or by actual disparate treatment accorded minority, as compared to white, voters.

In totality, conduct which had a racially discriminatory impact affected several hundred votes, which could have altered the outcome of the election.

A. Conduct which was irregular or illegal and had a discriminatory impact can be broken down into four categories: 1) the absence or late arrival of election materials (including bilingual materials) or inspectors at polling sites servicing predominantly minority voters; 2) the unfair and inconsistent treatment of parent voters, the great majority of whom were black, Puerto Rican or Chinese; 3) inconsistent policy with respect to requirement of identification which caused delays and denial of voting rights at polling sites servicing predominantly minority voters and other irregularities caused by the use of computer print-outs; 4) inadequate instruction of inspectors and interpreters, which adversely affected those voters who could speak, read or understand little or no English.

1. Absence or late arrival of materials.

All polls were supposed to be opened from 6:00 A.M. through 9:00 P.M. on May 1. However, several polls servicing predominantly minority voters opened substantially later than 6:00 A.M. This was caused by the late arrival either of the voting materials, including ballots or ballot boxes, or of the full complement of inspectors.[18] As examples, at P.S. 61

---

18. Although the school board elections were by law non-partisan, there was a great deal of testimony that the opening of certain polls was delayed until an equal number of

and P.S. 160, which service predominantly minority voters, the polls opened between 1½ and 2 hours late due to the absence of the full complement of inspectors. At P.S. 63, parent voters were prevented from voting until after 9:00 A.M. because of the absence of the parent voters book.[19]

Perhaps the most serious denials of the right to vote occurred at J.H.S. 71 and the Emmanuel Presbyterian Church. At J.H.S. 71, parent voter materials did not arrive at all, and all eighty-three registered parent voters (of whom 83% were Spanish-or Chinese-surnamed) did not have the opportunity to vote. At Emmanuel Church, no voting materials arrived and thus no voting took place, until after 12:30 P.M. This polling site services minority voters almost exclusively, and there was testimony that of the twenty-five or more voters who appeared in the morning to vote, and could not, almost all of them were Puerto Rican or black.[20] In sum, the evidence concerning missing materials or inspectors and resulting delays in the opening of polls related almost exclusively to polls servicing minority voters, and makes clear that many of these voters were denied the opportunity to vote by these practices.

Polling sites servicing predominantly white voters (e. g., 455 F.D.R. Drive) did not experience delays due to absence of materials or inspectors.

In addition, bilingual materials were not always readily available at the polls. Each ballot did contain instructions in Spanish, and the Board of Elections did mail out instruction sheets to each voter in Spanish as well as English. However, distribution on election day of "sample ballot placards" and "separate instruction sheets" in Spanish, *Chinese* and English, as required by the *Lopez* Order, in a manner in which the voters could be assisted thereby, was spotty at best. The effect of the absence of such materials would obviously be greatest on voters who spoke, read or understood little or no English.

2. Unfair and inconsistent treatment of parent voters.

In addition to the aforementioned denial of voting rights to parent voters resulting from the fact that parent voter books arrived late or not at all at P.S. 63 and J.H.S. 71, *supra*, the Executive Assistant State Attorney General, in charge of overseeing the election for state authorities, called by the defendants, also testified to the late arrival of parent voter books at P.S. 20 and J.H.S. 60 and possibly other polling sites.

There was also much confusion with regard to where parent voters had to vote, both as to which polling site, and which election district or table within each polling site.[21] While many parent voters were under the impression that their correct polling site was the school their child attended, not all District One schools served as polling sites on May 1 (e. g., J.H.S. 22, J.H.S. 56 [22]). Further, several parents of District One school children were improperly instructed to vote for District Two candidates at a school which contained polls for both districts.

---

Republican and Democratic inspectors were present.

19. Over 84% of the parent voters registered to vote at P.S. 63 were Spanish- or Chinese-surnamed.

20. The Board of Elections, when listing the polling sites for representatives of the State Attorney General's office, one of the many overseers of the election, failed to indicate that voting was to occur at Emmanuel Church.

21. Such confusion is understandable since the Board of Elections issued two sets of instructions to election inspectors, which contained conflicting instructions as to parent voters (see n. 29 *infra*).

22. The percentage of parent registrants from these two schools who reached their correct polling site and actually voted on May 1 was well below the average percentage of parent registrants from other schools who voted. At J.H.S. 56, this affected a parent registrant population that was 81% Spanish- and Chinese-surnamed.

This confusion undoubtedly denied some parent voters the right to an effective vote. We reiterate that the overwhelming majority of parent voters were Puerto Rican, black and Chinese, *supra.*

3. Inconsistent policy on identification and other irregularities caused by use of computer print-outs.

The use of computer print-outs instead of buff cards created a great dilemma for election inspectors. While formerly an inspector could verify the identity of a potential voter by comparing the buff card signature with the signature of the person appearing at the polls, use of the print-outs prevented this procedure. The Board of Elections did not establish nor inform its inspectors of any uniform policy with respect to verifying identification of voters on May 1.[23] As a result, inspectors at some election districts (E.D.'s) required written identification of voters before allowing them to vote, some required specific items of identification, others required no identification. At some E.D.s where inspectors required written identification, the failure to produce any written identification or such identification as was deemed satisfactory by the particular inspector, resulted in the denial of the right to vote even where the names and addresses were found on the computer list. In addition, the process of requiring documentary identification and determining its sufficiency added to the confusion and lengthened the lines.

At E.D.s where such identification was required, it was generally required of all voters, regardless of race or ethnicity.[24] However, with one exception, the polling sites at which it was required were only those which serviced predominantly minority voters (e. g., P. S. 34, P.S. 61, P.S. 160, Emmanuel Church).[25] For example, at P.S. 61, many black and Puerto Rican voters who were in fact on the computer lists were turned away for failure to produce sufficient identification. At a number of sites servicing predominantly white voters no identification was required. Therefore, in District One as a whole, the effect of the failure to institute a uniform policy with respect to identification had a discriminatory impact on minority voters.

The use of computer lists created several other irregularities, two types of which had a racially discriminatory impact.[26] In certain election districts in which the populace was predominantly white, certain persons whose names did not appear on the print-out but whose names were known to the inspector, were allowed to vote, and a notation to this effect was made on the print-out. In other E.D.s, compliance with the rule that a voter's name had to appear on the print-out (or a court order obtained) in order to be enabled to vote was more strictly observed.

Also, the alphabetized print-outs created a problem for many inspectors because of their unfamiliarity with Spanish and Chinese names. In fact, this problem was not limited to the print-out of regularly registered voters, but was also present with respect to the alphabetized buff cards for parent voters.

23. In fact, one of the two instruction sheets sent by the Board of Elections to inspectors for May 1, 1973 refers only to buff cards and makes no reference at all to computer print-outs. Neither instruction sheet (Defendants' Exhibits J, M) provides for any documentary identification requirement. Nor have the defendants cited any statutory authority for the documentary identification requirement.

24. But see n. 25 *infra.*

25. The exception was P.S. 63, which is not a site servicing predominantly minority voters. However, there was testimony that the identification requirement at P.S. 63 was not administered evenly as between white and minority voters.

26. An example of an irregularity which did not have a demonstrably greater impact on minority voters than on white voters was the high number of errors estimated (10-15%) in transferring information from the buff cards to the computer print-out.

Spanish and especially Chinese voters' names were often incorrectly alphabetized, sometimes because the clerical employee's unfamiliarity with such names led to their being inverted or lost among several names which were similar.[27] This caused substantial delays at polling sites at which these voters appeared, and in some cases, denial of voting rights.

Taken alone, these last two irregularities may not have affected the voting rights of a substantial number of minority, as opposed to white, voters. However, they cannot be taken alone; they must be tallied up with all of the other irregular practices.

4. Inadequately instructed inspectors and interpreters.

The testimony is replete with incidents of difficulties experienced in voting at polls servicing predominantly minority voters resulting from conduct of election inspectors, who are paid employees of the Board of Elections.[28]

Some of the responsibility for the conduct of these inspectors must rest with the Board of Elections. Although the Board usually conducts training sessions for inspectors, there was credible testimony that such sessions were not conducted specially for the May 1 election, and no credible testimony to indicate that they were. Also, the defendants themselves have demonstrated that inspectors received contradictory instructions concerning the May 1 election.[29]

Finally, some inspectors were seen using at polls servicing predominantly minority voters an election manual applicable to past elections, but not to the May 1 school board election. This manual referred to the use of voting machines (the May 1 election employed paper ballots) and more importantly, referred to a literacy requirement (Plaintiffs' Ex. 10, p. 19). The special May 1 instructions (*supra* n. 29) did not indicate that they superseded this manual.

The lack of training of, and inconsistent or incorrect instructions to inspectors was especially disruptive of orderly processes in light of the several unique procedures in the May 1 election.

The Board of Elections also did not train nor instruct interpreters in any uniform way. Many interpreters were thus unaware of their proper functions or of the proper way to offer assistance. Inspectors were also not familiar with

27. This phenomenon was graphically illustrated at the hearing. On direct examination, Mrs. Yatkowitz, a Board of Elections employee, failed to find a parent voter card of one Lee Ching Chan from among the parent cards for P.S. 63. Her testimony was designed to rebut Miss Chan's earlier testimony concerning the difficulty she experienced on election day. Instead, Miss Chan's testimony was corroborated when, on cross-examination of Mrs. Yatkowitz, it was pointed out that Miss Chan's parent card was in fact among the group first shown to Mrs. Yatkowitz, and that Mrs. Yatkowitz had been unable to find it because it, and other Chinese parents' cards bearing middle and last names similar to Ching and Chan, were incorrectly alphabetized.

28. For example, an inspector examined completed ballots before putting them in the ballot box; inspectors allowed unauthorized personnel to sit at their tables and assist in their functions; inspectors failed to make a thorough search of the computer print-out lists to find voters who were in fact on those lists; inspectors failed in many cases to distribute bilingual materials or inform voters of the possibility of receiving language assistance from the interpreters; and inspectors gave incorrect instructions to voters concerning where and how to vote.

29. For example, defendants' Exhibit M, entitled "Instructions to Inspectors, Community School Board Elections, May 1, 1973", and included in the materials delivered to inspectors at the polls, speaks only of buff cards and of parent cards being assigned to separate election districts. Plaintiffs' Exhibit 9, (identical to Defendants' Exhibit J for identification) entitled "Community School Board Election, Borough of Manhattan, May 1, 1973 6 a. m. to 9 p. m., Instructions to Inspectors" and mailed to inspectors prior to the election, speaks of a "list of Registered Voters . . . . in place of [the buff cards]," and indicates that all parent voters would be assigned to one election district at any school site.

interpreters' proper functions [30] and refused in several instances to allow interpreters to assist unless the voter specifically requested such assistance.[31] Because of a lack of instruction or consistent procedure, interpreters may have acted improperly in some instances. The result was that inspectors or representatives of the Attorney General then moved to prevent the interpreter from performing even their legitimate functions. This had serious adverse consequences for voters who spoke, read, or understood little or no English.

In general, the failure of the Board of Elections to provide adequate training for inspectors and interpreters put an excessive amount of discretion in the hands of inspectors unfamiliar with the special nature of this election or the special needs of minority (especially non-English speaking) voters. The result of superimposing a usually partisan electoral process on special school board elections caused an abuse of discretion by the inspectors to the detriment of the rights of minority voters.

B. Conduct which was not on its face illegal or irregular but which had a discriminatory impact on the voting rights of minority voters and was neither explained nor justified by the defendants included 1) wholesale changes in election districts and polling sites in areas servicing predominantly minority voters and 2) placing of polling places in middle-class housing projects to facilitate voting of white voters, without the same advantages for minority voters.

1. Changes in election districts and polling sites.

Between the general elections in November, 1972 and the school board elections on May 1, 1973, the Board of Elections created eleven new election districts from existing districts in the 63rd Assembly District, which encompasses most of District One.[32] Voters in seven of these districts [33] were assigned to new polling places. The Board of Elections also redrew the lines between old election districts in three instances [34] and changed the polling site of one district which was not renumbered.[35] With minor exceptions, these changes occurred in areas with greater than 40% minority population, and most occurred in areas of greater than 60% minority population. Election districts and polling sites in areas which were 80%–100% white remained unchanged, with the exception of the 60th E.D.

Except in the most general way, and for the first time in their post-trial memorandum of law, defendants gave no explanation for these changes; and have never explained why they occurred almost exclusively outside of white areas.

Despite the fact that the Board of Elections mailed out to each voter notices informing them of their polling sites, there was testimony that many voters did not receive them.[36] Many voters whose polling sites had been changed came to vote at the wrong sites. When they did so, election inspectors were often unable to direct them to the correct sites due to the complete absence

---

30. The only instructions inspectors received with respect to interpreters was that they were available and were not to electioneer.

31. This appears to have been inconsistent with at least the spirit of the *Lopez* Order. (See n. 5 *supra*.)

32. The following new E.D.s were created: 50, 51, 52, 53b, 54, 55, 56, 57, 58, 59, 60.

33. 50, 51, 55, 56, 57, 58, 60.

34. The following E.D. lines were redrawn: 1) between 31 and 32; 2) between 18, 27 and 28 and 3) between 21, 23 and 24.

35. The 30th E.D.

36. It is perhaps ironic that the only piece of mail from the Board of Elections put into evidence and testified to as having been actually received by a District One resident was Plaintiffs' Exhibit 9, which informed inspector Miriam Rios to report for duty at the 30th E.D. but failed to inform her that the polling site for the 30th E.D. had been moved from its accustomed place, P.S. 34, to a completely new polling site, Emmanuel Church.

from the polls of election district maps or other common devices which enable an inspector to pinpoint a voter's revised election district or polling site merely by knowing his address. Inspectors who attempted to direct voters to their new polling site in some cases sent such voters on long, futile searches which may have resulted in the voter having failed to vote.

Since the majority of changes in polling sites occurred in predominantly Puerto Rican, black and Chinese areas, it was these voters who were most adversely affected by this haphazard process.

### 2. Poll placement.

The placement of polling sites also had a racially discriminatory impact on the voters in the May 1 election. Six voting sites were placed in large, predominantly white middle-income housing projects.[37] This greatly facilitated the voting process for residents of these buildings. The percentage turnout in election districts located in these buildings was 54.90%, well above the District average of 22.45%.

No polling sites were located in buildings housing predominantly Puerto Ricans or blacks; nor was any explanation for this site selection offered by the defendants.

### C. Instances of intentional discrimination.

There is no evidence that the Board of Elections or the Board of Education intentionally discriminated against minority voters in the May 1 District One election. However, there were scattered incidents of intentionally discriminatory conduct by individual election inspectors.

For example, particular inspectors were hostile and abusive to particular Puerto Rican and black voters. Certain inspectors instructed Puerto Rican and Chinese voters to mark their ballots so as to render them invalid. One inspector at P.S. 63 required written indentification of a white voter and her black companion, but did not require such identification when white voters appeared alone.

We reiterate that these various acts of intentional racial discrimination were not done pursuant to any instructions from the chief administrators of the school board elections. Nor do we find that they caused a denial of voting rights to a large number of voters. Rather, they were perhaps the inevitable result of putting an excessive amount of discretion in the hands of untrained election inspectors, agents and employees of the Board of Elections, in an already racially tense environment. When combined with the practices and procedures outlined above, these acts and omissions denied equal voting rights to a substantial number of black, Puerto Rican and Chinese voters and potential voters in District One.

### Conclusions of Law

■■ The plaintiffs allege violations by the defendants of rights protected by the Fourteenth and Fifteenth Amendments to the United States Constitution and the Voting Rights Act of 1965 as amended in 1970. 42 U.S.C. § 1971, 42 U.S.C. § 1973 et seq. This Court has jurisdiction over such claims under 28 U.S.C. § 1343(3). The defendants who were officials of the New York City Board of Education or Board of Elections and their employees and agents, including election inspectors, all acted under color of state law.

■■ We start from the established premise that racial or ethnic discrimination in the electoral process violates the Equal Protection clause of the Fourteenth Amendment, and the Fifteenth Amendment to the United States Consti-

---

37. 455 F.R.D. Drive (4th & 5th E.D.s) ; 475 F.R.D. Drive (6th & 7th E.D.s) ; 504 Grand St. (9th & 10th E.D.s) ; 383 Grand St. (11th E.D.) ; 77 Columbia St. (20th E.D.) ; 175 E. 4th St. (41st & 42nd E.D.s).

tution, as well as the Federal Voting Rights Acts, 42 U.S.C. §§ 1971, 1973.[38]

This is well-established because of the sanctity with which we regard the individual's fundamental right to vote and have his vote count equally with that of all other voters, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); combined with the suspicion with which we view any racial or ethnic distinction resulting from governmental actions or omissions. White v. Regester, *supra*; McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

■ Governmental practices which result in distinctions among voters and potential voters are subject to the strictest judicial scrutiny when the distinctions run along racial or ethnic lines. Such equal protection principles clearly apply to local school board elections. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L. Ed.2d 583 (1969); Oliver v. Bd. of Education of the City of New York, 306 F. Supp. 1286 (S.D.N.Y.1969); Brown v. Post, 279 F.Supp. 60 (W.D.La.1968).

■ Discrimination in voting rights is no less repugnant to the Equal Pro-

tection clause because it is the result of governmental administrative practices or procedures, and not specific statutes. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Baker v. City of St. Petersburg, 400 F.2d 294 (5th Cir. 1968); United States v. Dogan, 314 F.2d 767 (5th Cir. 1963).

■ Nor have this and other circuits found it constitutionally significant that, as in this case, the largest racially discriminatory impact was not due to intentional discrimination of government officials, but rather was the natural result of their policies and pronouncements which on their face were neutral. Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920 (2d Cir. 1968); Hawkins v. Town of Shaw, Miss., 461 F.2d 1171 (5th Cir. 1972) (en banc); Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C. 1967), aff'd. sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); Ury v. Santee, 303 F.Supp. 119 (N.D.Ill.E.D.1969). Racial discrimination, whether intentional or unintentional, has been condemned as unconstitutional when the right to an effective vote is at stake. Harper v. Virginia Board of Elections, *supra*; Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Toney v. White, 348 F.Supp. 188, 195 (W.D.La.1972), aff'd in pertinent part, 476 F.2d 203

---

**38.** Although specific practices on May 1 can be considered violations of specific sections of the Voting Rights Acts and Amendments (e. g. the lack of effective bilingual assistance violated 42 U.S.C. § 1973b(e) and 42 U.S.C. § 1973aa. Puerto Rican Organization for Political Action v. Kusper, 490 F.2d 575 (7th Cir., 1973)), we view the policies and practices of the May 1 District One election in their totality, and find it unnecessary to evaluate them in any but general equal protection terms.

Black, Puerto Rican, and Chinese voters and potential voters may each constitute an identifiable class for purposes of the Fourteenth Amendment. See e. g. White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L. Ed.2d 314 (1973); Katzenbach v. Morgan,

384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Because of the similarities in the problems incurred by these groups with respect to voting rights on May 1 in District One, we have considered them together as an identifiable class for purposes of the Fourteenth Amendment, Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) White v. Regester, *supra*, despite the fact that, taken together, they constitute almost a majority of the resident population and over 90% of the school population in District One.

(5th Cir. 1973); United States v. Post, 297 F.Supp. 46, 51 (W.D.La.1969).

■ Applying these principles, this Court finds that the practices employed by the defendants on May 1 resulted in the election being conducted in a manner which denied minority voters equal protection of the law.

Although strict judicial scrutiny of a racially disparate impact on voting rights might in theory reveal a "compelling state interest" sufficient to validate the challenged practices (see e. g. Korematsu v. United States, supra), such is not the case at bar. In fact, most of defendants' practices discussed in the Findings of Fact are not buttressed in the record by evidence of any state interest. These practices do not even bear a "rational relationship" to a legitimate state interest, so as to pass muster under the least stringent equal protection test.

First and foremost, a majority of the actual votes affected probably resulted from the irregularities discussed in Part IIIA, supra. Polls did not open on time; parent materials and bilingual materials arrived late or not at all; the documentary identification requirement was employed at polls servicing minority voters almost exclusively; inspectors and interpreters were inadequately prepared. These irregularities had a discriminatory impact on minority voters and, as deviations from established procedure, could not serve any state interest, let alone a compelling one. Indeed, even the use of computer print-outs, which directly and indirectly caused many of the irregularities, was not justified on the record.

Second, the defendants' evidence offered little or no justification in terms of the state's interest in any of the practices discussed in Part IIIB supra, which, while not irregular, had discriminatory impact on minority voters.

■ Concerning the changed polling sites, the defendants state in their post-trial memorandum of law:

State-wide reapportionment as a result of the 1970 Census Reports of necessity required a change in the lines of various assembly districts which in turn required changes in the lines of election districts contained therein.

Beyond this generalization, there is nothing in the record to explain why the particular changes in polling sites and election districts occurred in largely minority areas. Nor is there any explanation as to why the voters were not effectively notified of these changes. While defendants' general explanation could perhaps be expanded to demonstrate the necessity for many of the changes, we cannot speculate as to what such demonstration might show.

■ Similarly, the placement of polling sites in residences of white voters and not minority voters was not explained. Defendants' post-trial memorandum stated:

The use of community rooms as polling places in white districts was never intended to discriminate racially.[39] This was done because such community rooms were located in large high-rise apartment complexes where a sufficient number of people resided to constitute an Election District.

Aside from the fact that no data to this effect is included in the testimony or exhibits, this statement fails to explain why these apartment house polling places were only situated in white areas. The disproportionately high turnout at these polling sites leads us to conclude that this practice had a racially discriminatory impact.

While these last two practices had perhaps a less substantial discriminatory impact than the irregularities, they did have some such impact, and the state's

---

**39.** We find no basis in the record to disagree with this statement, but find it not conclusive on the issue of discrimination.

interest in these procedures was not demonstrated.

Finally, as to the isolated instances of intentional discrimination, there was no attempt, as there could not be, to justify them. Defendants contend that such incidents were not intended to discriminate. We find to the contrary, as to certain of the instances, although we reiterate that the total impact of intentional discrimination alone was not substantial.

In sum, this Court finds that the procedures actually employed on May 1 in District One resulted in an election in which minority voters' rights were impaired to a substantial degree. Such procedures did not demonstrably serve the state's interests. The state has an interest and election officials an affirmative duty under the Fourteenth and Fifteenth Amendments and the Voting Rights Acts to see to it that the voting rights of all classes of voters are not impaired. Toney v. White, *supra*; Brown v. Post, *supra*; Ury v. Santee, *supra*. While we cannot determine to a mathematical certainty whether this impairment of rights modified the outcome of the election, we conclude that such a possibility has been demonstrated. We find that the May 1 school board election in District One resulted in substantial constitutional infringements to minority voters and potential voters, and was therefore unconstitutionally conducted.

### Remedy

Defendants do not contend that racial and ethnic discrimination in the election process, whether intentional or unintentional, is permissible. Rather, they argue that a finding of discrimination does not require setting aside an otherwise valid election.

The federal courts have broad discretionary power to void a state election found to be discriminatory, and to require a new election, Hamer v. Campbell, 358 F.2d 215 (5th Cir. 1966) cert. denied 385 U.S. 851, 87 S.Ct. 76, 17 L. Ed.2d 79 (1966); State of Alabama v. United States, 304 F.2d 583, 591 (5th Cir.) aff'd per curiam 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962); United States v. Post, *supra*; Brown v. Post, *supra*; although such relief is drastic and its use should be guardedly exercised. Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967).

The Findings of Fact contained herein demonstrate that, unlike *Bell*, this case is not one where the discrimination was the result of the defendants' evil motive or where it was "gross, spectacular and wholly indefensible". 376 F.2d at 664. Nevertheless, we have found that the instances of discrimination were substantial, so much so that they could very well have modified the outcome of the election. Under these circumstances, as was held in a recent *en banc* Fifth Circuit opinion, Toney v. White, 488 F.2d 310 (1973) and cases cited therein, we still can set aside the discriminatory election if the equities warrant it, and, if we conclude that the plaintiffs acted diligently in asserting their rights.

Plaintiffs' diligence in asserting their claims prior to the election has been considered an important factor in determining the question of setting aside a discriminatory election. Toney v. White (*en banc*) *supra*; Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966) aff'd in pertinent part 386 F.2d 979 (5th Cir. 1967); United States v. Democratic Executive Committee, 288 F.Supp. 943 (M.D.Ala.1968); McGill v. Ryals, 253 F.Supp. 374 (M.D.Ala.) (three-judge court) appeal dismissed 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17 (1966). The theory is, of course, that plaintiffs should not be permitted to complain about the results of an election if they failed previously to complain about the procedures (of which they had notice) under which the election was to be conducted. In this case, plaintiffs' pre-election diligence is unassailable. Several of these plaintiffs, along with other minority voters in New York City, instituted at least two successful lawsuits prior to the election, (see p. 3 and p. 8, n. 8 *supra*) seeking relief from unconstitutional procedures. In addition, vari-

ous groups of minority representatives lobbied the Board of Elections for policy changes. That which was not litigated nor lobbied for prior to the election could not have been, since many of the discriminatory practices did not surface until election day. To the extent they could, these plaintiffs and other minority residents of District One diligently pursued their rights prior to the election.

■ In the final analysis, we believe the remedy sought by the plaintiffs— setting aside the May 1 election and the ordering of a new election—is necessary and proper in this case for at least three basic reasons. First, given the substantial violation of constitutional rights which occurred on May 1, we perceive no effective alternative which would vindicate these rights, nor have any of the parties suggested any alternative. Prospective relief alone would be of little consequence or comfort to the many voters who sought to vote, many for the first time, on May 1, and could not do so effectively. In this posture, refusal to set aside the May 1 election and order a new election would be tantamount to telling these voters and potential voters that, although they were wronged, the federal courts are powerless to effectively redress their grievances. This we will not do.

Second, the facts of this case make it particularly necessary that we nullify the discriminatory impact of the election. Whereas in general governmental elections all voters have an equal stake in the outcome, in school board elections parent voters have a unique interest since their children are directly benefited or harmed by the educational policies promulgated by any elected school board. We need not engage in any debate on the merits of any particular educational policy to conclude that in this case, parent voters, the overwhelming majority of whom were black, Puerto Rican and

Chinese, had a disproportionately high interest [40] in a fairly conducted election, because those elected would be making decisions affecting the education and daily lives of their children. Where the election was not fairly conducted, and especially where the group with the greatest stake in the outcome was also subjected to the greatest inequity, the results cannot be allowed to stand.

Finally, we have carefully considered the factor of the community's interest in stability and the orderly transition of school district government. McGill v. Ryals, *supra*. This Court is not blind to the atmosphere of intense racial hostility which has existed in District One throughout the last several years. While the total community dispute is not before this Court, our consideration of the appropriate remedy must include consideration of whether the remedy we choose enhances the conflict or effectively resolves that part of it which has properly been brought before us.

We conclude that the community interest in stability and orderly transition, especially in light of the constitutional violations which we have found, may be best served by holding a new election. The election and installation of the school board elected on May 1 was not followed by orderly transition nor stability; on the contrary, the subsequent District One school governance situation can only be termed chaotic. We do not presume that a new election will necessarily remedy this situation; we merely observe that the factors which prompted the *McGill* three-judge court to refuse to set aside an illegal election are not present in this case.

Having balanced the equities, we conclude that the public interest in fair electoral processes requires that the challenged election be set aside, and a new election held which employs procedures which allow all those who wish to vote, and who qualify, to cast an effective vote.

---

**40.** See p. 48 *supra,* where we find that the proportion of minority members among parent voters was significantly higher than the proportion of minority members among the regularly registered resident voters.

APPENDIX

| POLLING SITE | ED | AD | % Blacks and Puerto Ricans per ED According to Census Figures | % Chinese and Spanish Surnamed Parent Voters per School * | Status of Change to ED |
|---|---|---|---|---|---|
| Center 284 Delancey Street | 22 | 63 | 60–100% | | unchanged |
| Community Room 455 FDR Drive | 4 | 63 | 0–20% † | | unchanged |
| | 5 | 63 | 0–20% † | | unchanged |
| Community Room 475 FDR Drive | 6 | 63 | 0–20% † | | unchanged |
| | 7 | 63 | 0–20% † | | unchanged |
| Community Room 804 Grand Street | 9 | 63 | 0–20% † | | unchanged |
| | 10 | 63 | 0–20% † | | unchanged |
| Community Room 333 Grand Street | 11 | 63 | 0–20% † | | unchanged |
| Community Room 77 Columbia | 20 | 63 | 40–60% [1] | | unchanged |
| Community Room 170 Ave C | 33 | 63 | 0–60% | | ED divided, creating new 57th ED. New 57th ED voters had polling site moved to PS 61. |
| Community Room 175 East 4 Street | 41 | 63 | 0–20% † | | unchanged |
| | 42 | 63 | 0–20% † | | unchanged |
| Emanuel Church 737 East 6 Street | 30 | 63 | 60–100% | | ED divided, creating new 58th ED, with polling site at PS 64. Polling site for voters remaining in 30th ED moved from PS 34. |
| Settlement House 283 Rivington Street | 21 | 63 | 60–100% | | ED line changed along border with 23rd ED, affecting change in polling site for some old 21st ED voters. |
| Seward Park Annex 200 Monroe Street | 1 | 63 | 20–40% | | unchanged |
| | 2 | 63 | 20–40% | | unchanged |
| | 16 | 62 | 40–60% | | unchanged |
| Veterans Building 33 East 7 Street | 39 | 64 | 0–20% | | unchanged |
| PS 2 112 Henry Street | 15B | 62 | 40–60% | Not a District One School | ED divided between School Districts 1 and 2. |
| | 13B | 62 | 40–60% | | ED divided between · School Districts 1 and 2. |
| PS 4 203 Rivington Street | 19 | 63 | 40–60% | 91.95% | unchanged |
| PS 15 333 East 4 Street | 26 | 63 | 60–100% | 89.35% | ED divided, with voters assigned to new 54th ED. |
| | 54 | 63 | 60–100% | | Created from old 26th ED. |
| | 55 | 63 | 40–100% | | ED created from old 29th ED, which resulted in change in polling site as well. |

† Virtually all white housing area.

[1] While *Census tract for whole area shows* 40–50% Blacks and Puerto Ricans, this ED comprised mainly of a white middle income housing project area.

* The percentage of Parent Voters who are Chinese or Spanish surnamed was derived by counting the names on the parent cards which were at the polling sites. There was no accurate way to measure the number of Black parents who were registered as parent voters by a superficial examination of the cards alone, and thus the percentage does not reflect the number of Black parent voters. With the inclusion of Black parents, the percentage of racial minority voters would of course be increased.

APPENDIX—Continued

| POLLING SITE | ED | AD | % Blacks and Puerto Ricans per ED According to Census Figures | % Chinese and Spanish Surnamed Parent Voters per School * | Status of Change to ED |
|---|---|---|---|---|---|
| PS 19 135 First Avenue | 45 | 63 | 20–40% | 76.19% | unchanged |
| | 46 | 63 | 20–40% | | ED divided, with some old 46th ED voters assigned to new 60th ED. |
| | 94 | 64 | 20–40% | | unchanged |
| | 36B | 64 | 0–20% | | ED divided between School Districts 1 and 2. |
| | 40 | 64 | 20–40% | | unchanged |
| | 41 | 64 | 20–40% | | unchanged |
| PS 20 166 Essex Street | 17 | 63 | 40–100% | 78.67% | unchanged |
| PS 34 730 East 12 Street | 31 | 63 | 60–100% | 80.95% | Line redrawn between 31st and 32nd EDs. |
| | 32 | 63 | 60–100% | | Line redrawn between 31st and 32nd EDs. |
| JHS 60 420 East 12 Street | 36 | 63 | 40–60% | 87.39% | ED divided, with voters assigned to new 58th ED at different polling site. |
| | 43 | 63 | 40–60% | | unchanged |
| PS 61 610 East 12 Street | 35 | 63 | 40–60% | 70.16% | unchanged |
| | 58 | 63 | 40–60% | | ED created from part of old 36th ED. Polling site moved from JHS 60. |
| | 57 | 63 | 40–60% | | ED created from old 33rd and 34th EDs, with polling site for affected voters moved from 170 AVE C. |
| PS 63 121 East 3 Street | 38 | 63 | 0–20% | 84.51% | unchanged |
| | 39 | 63 | 20–40% | | ED divided, with some voters assigned to new 59th ED. |
| | 40 | 63 | 0–20% | | unchanged |
| | 48 | 63 | 20–40% | | ED divided, with some voters assigned to new 51st ED at different polling site. |
| | 59 | 63 | 20–40% | | ED created from old 39th ED. |
| PS 64 605 East 9 Street | 34 | 63 | 40–60% | 91.57% | ED line of old 34th ED redrawn, with some voters reassigned to 57th ED. |
| | 56 | 63 | 60–100% | | ED created from old 30th ED with voters assigned to vote at PS 64 instead of PS 34 as before. Other 30th ED voters also reassigned to Emanuel Church from PS 34. |
| JHS 71 600 East 6 Street | 27 | 63 | 60–100% | 83.13% | ED line redrawn along border of 28th ED and along border of 18th ED. |
| | 28 | 63 | 60–100% | | ED line redrawn along border with 27th ED. |
| | 29 | 63 | 40–60% | | ED divided, with some voters assigned to new 55th ED and sent to new polling site. |
| | 37 | 63 | 0–20% | | unchanged |
| PS 82 371 Madison | 3 | 63 | 20–40% | Special School | unchanged |

APPENDIX—Continued

| POLLING SITE | ED | AD | % Blacks and Puerto Ricans per ED According to Census Figures | % Chinese and Spanish Surnamed Parent Voters per School * | Status of Change to ED |
|---|---|---|---|---|---|
| PS 91<br>198 Forsyth Street | 15 | 63 | 60–100% | Special School | ED divided, with voters assigned to new 51st and 53rd EDs, and some re-assigned to vote at PS 169. |
| | 50 | 63 | 60–100% | | ED created from old 48th ED and polling site changed from PS 63. |
| | 53B | 63 | 20–40% | | ED created from old 15th ED. Voters from this ED divided between School Districts 1 and 2. |
| PS 97<br>134 Mangin Street | 23 | 63 | 60–100% | 81.03% | ED lines between 23rd and 24th and 21st ED redrawn, and polling site affected by redrawn lines. Moved since November 1972. |
| PS 110<br>28 Cannon | 8 | 63 | 0–20% | 56.52% | unchanged |
| PS 122<br>160 First Avenue | 44 | 63 | 20–60% | 85.68% | unchanged |
| | 47 | 63 | 0–20% | | unchanged |
| | 60 | 63 | 0–20% | | ED created from old 46th ED. Polling site moved from PS 19. |
| PS 134<br>311 East Broadway | 12· | 63 | 0–20% | 84.38% | unchanged |
| | 13 | 63 | 0–60% | | unchanged |
| PS 140<br>123 Ridge | 18 | 63 | 40–60% | 83.58% | Old 18th ED redrawn, with new 52nd ED created and some voters from old 27th ED assigned to new 18th ED, affecting their polling place location. |
| | 52 | 63 | 40–60% | | ED created from old 18th ED. |
| PS 160<br>107 Suffolk | 14B | 63 | 40–60% | 84.65% | ED divided between School Districts 1 and 2. |
| | 16 | 63 | 40–60% | | unchanged |
| PS 169<br>113 East 4 Street | 49 | 63 | 0–40% | Special School | unchanged |
| | 51 | 63 | 20–40% | | ED created from old 15th ED, and polling site moved from PS 91. |
| | 36 | 64 | 0–20% | | unchanged |
| | 37 | 64 | 0–20% | | unchanged |
| | 38 | 64 | 0–20% | | unchanged |
| | 93 | 64 | 0–20% | | unchanged |
| PS 188<br>131 Lewis | 24 | 63 | 60–100% | 86.49% | ED lines redrawn between 23rd and 24th ED. Some old 24th ED voters thus reassigned to vote at PS 97. |
| | 25 | 63 | 60–100% | | unchanged |

SUMMARY

Of the 15 EDs for areas with a Black and Puerto Rican population of 60–100%, 13 were changed in some way between November, 1972 and May, 1973.

Of the 22 EDs for areas with a Black and Puerto Rican population of 0–20%, only 2 were changed in any way between November, 1972 and May, 1973. One of the two was an ED which was divided between School Districts One and Two.