Mars KETCHUM, et al., Plaintiffs,

and

United States of America,
Plaintiff-Intervenor,

v.

CITY COUNCIL OF the CITY OF CHICAGO, ILLINOIS,
Defendants.

Nos. 82 C 4085, 82 C 4431 and 82 C 4820.

United States District Court,
N.D. Illinois, E.D.

Dec. 27, 1985.

On Motion for Special Elections
Dec. 30, 1985.

---

Jeffrey D. Colman, Michael T. Brody, Jenner & Block and Richard H. Newhouse, Jr., Chicago, IL, for Ketchum.

Judson H. Miner, Bridget A. Arimond and Davis, Miner, Barnhill and Galland, Chicago, IL, for PACI.

Raymond G. Romero and The Mexican American Legal Defense and Education Fund, Chicago, IL, for Velasco.

Margaret C. Gordon, Asst. U.S. Attorney, Chicago, IL, William Bradford Reynolds, Paul F. Hancock, Robert S. Berman, Mark A. Posner, Michael J. Gennaco, U.S. Dept. of Justice, Civil Rights Division, Voting Rights Section, Washington, D.C., for United States.

James D. Montgomery, Corp. Counsel, Joel D. Stein, Chief Asst. Corp. Counsel, Deborah L. Thorne, Peggy A. Davis, Asst. Corp. Counsel, Chicago, IL, for City Council.

Mchael Levinson on behalf of defendant Chicago Board of Election Commissioners.

William J. Harte, Jeffrey B. Whitt, Chicago, IL, for certain defendant-intervenors.

## ORDER

NORGLE, District Judge.

This case is before the court on remand from the United States Court of Appeals for the Seventh Circuit.[1] The Seventh Circuit remanded the case to this court to fashion an appropriate remedy for established violations of section 2 of the Voting Rights Act of 1965, as amended in 1982. 42 U.S.C. § 1973 (1982). The earlier court-ordered map failed to provide "an adequate remedy for the Voting Rights Act violation because it [did] not eliminate, in accordance with well-accepted principles of redistricting, the illegal dilution of minority voting strength accomplished by the City Council Map." *Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir.1984). The *sole* purpose of this remand is to remedy the illegal dilution of minority voting strength within the guidelines set by the court of appeals and section 2. Before turning to the particulars of the court of appeals' decision a short procedural background is necessary.[2]

This is a consolidated action which contested the 1981 Chicago Ward redistricting plan (City Council map), approved and adopted by the City Council of the City of Chicago on November 30, 1981. The three plaintiffs are groups of Black (*Ketchum*) and Hispanic (*Velasco*) voters and a black political organization (Political Action Conference of Illinois and four individuals) [hereinafter, collectively "PACI"]. The only remaining defendant from the original action is the City Council of the City of Chicago (City Council). The United States was permitted to intervene as plaintiff in the action.

The plaintiffs challenged the City-Council map on two fronts: section 2 of the Voting Rights Act and the fourteenth and fifteenth amendments. The district court found that only a section 2 violation existed and rejected the intentional discrimination basis of liability. In finding a section 2 violation, the district court concluded the City-Council map violated section 2 in that it decreased the number of Black majority Wards that existed in 1980 under the 1970 map.[3] The court ordered the restoration of the 19 Black majority wards and set a simple majority of voting age population as the indication of a majority ward. Additionally, the court-ordered map created four Hispanic majority wards.

Plaintiffs appealed from the district court's 1982 approved plan. Plaintiffs asked the appellate court to find the City Council had intentionally discriminated against plaintiffs in violation of the fourteenth and fifteenth amendments and to find the City Council map diluted minority voting strength through four techniques—packing, fracturing, retrogression, and boundary manipulation. Plaintiffs sought reversal of the district court's finding that

1. The Seventh Circuit's opinion was decided August 14, 1984. *See Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984). The United States Supreme Court denied *certiorari* on June 3, 1985. *Ketchum v. Byrne*, —— U.S. ——, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).

2. The court of appeals' decision details the procedural history of the City-Council map and this

litigation. It is unnecessary to repeat that history (going to the issue of establishing a violation) here.

3. The district court concluded the only section 2 violation which existed under the City-Council map was the city-wide retrogression in the Black communities.

the City Council map only violated § 2 because of city-wide retrogression from 19 Black majority wards in 1980 under the 1970 map to 17 Black majority wards in the City Council map. The appellate court declined to find that the City Council intentionally discriminated against minorities because "there appear[ed] to be no difference in the practical result or in the available remedy regardless of how the resulting discrimination [was] characterized." *Ketchum*, 740 F.2d at 1409–10 nn. 10 & 11.[4] The court did note the "apparently close analogy" between the facts in this case and *Rybicki I*, which had found intentional discrimination in the legislative redistricting of Illinois legislative districts. Most significantly, the court noted the various methods used by the City Council to discriminate against minorities in redistricting particular wards.[5]

The court then turned to the remedial aspects of the Section 2 violation. In discussing the appropriate remedy, the Seventh Circuit addressed the underlying assumptions of the district court in approving the court-ordered map, and provided guidance to this court in redistricting the ward remap. Specifically, the court concluded:

1) The district court's previous assumption that any majority greater than 50% of the voting age population was sufficient to define a majority was an inadequate definition of an "effective majority." *Id.* at 1413–17.

2) The usage of voting age population statistics, if reliable, is an appropriate device to measure voting strength. *Id.* at 1412–13.

3) A supermajority corrective of 65% should only be utilized if the court concludes, after consideration of turnout and registration statistics of Black and Hispanic voters, that there is a "practical need" for such a corrective in order to give minorities a reasonable and fair opportunity to elect candidates of their choice. *Id.* at 1413–17.

4) Relevant to the above determination, the district court should consider recent trends in the electoral patterns of Black and Hispanic communities to determine the need for a corrective.

5) Whatever corrective is ultimately adopted, if any, the district court should justify its reliance on the statistics, and the numbers on which they are based, keeping in mind the creation of an "effective majority."

6) A restoration to majority percentage figures prior to the City Council map is unnecessary, i.e., retrogression *within* wards need not be addressed. *Id.* at 1414.

7) In the 15th and 37th wards, which demonstrated the greatest retrogression through boundary manipulation, a 65% corrective would be considered a "fair antidote" to restore pre-redistricting majorities. *Id.* at 1417.

---

**4.** The court stated that it was unnecessary to reach the difficult question of intentional discrimination. The 1982 amendments of the Voting Rights Act "wisely eliminated the elusive and perhaps meaningless issue of governmental 'purpose'" by establishing an "effects" tests based on the totality of the circumstances. *Ketchum*, 740 F.2d at 1409. Because the practical result of a finding of intentional discrimination and a violation of the Voting Rights Act was the same and there was apparently no difference in available remedies, the court avoided any "superfluous" finding of intentional discrimination. In its discussion of the appropriate remedy, however, the court identified instances of fracturing, retrogression, and boundary manipulation. In ordering a remedy, "commensurate" with the established violations, we refer to those identified violations.

**5.** The court of appeals identified several violations of § 2. Specifically, the court noted that the City-Council map fractured the Black community on the South-side, fractured the Hispanic community, caused city-wide retrogression of Black voting strength, and displaced Black majorities in two wards through boundary manipulation. In ordering the remand of the court-approved map, the court of appeals stated that this court should rectify "in accordance with well-accepted principles of redistricting" the dilution of minority voting strength. This court, therefore, must be satisfied that the identified violations above, based on the totality of the circumstances, have been fully remedied before approving any redistricting map for the City of Chicago.

8) The city-wide retrogression must be redressed. The number of Black majority wards should be restored to the number which existed in 1980 under the 1970 map (19). *Id.*

9) The court should consider whether four Hispanic wards, with sufficient majorities, can be created to provide Hispanics a reasonable opportunity to elect candidates of their own choice. *Id.* at 1418.

10) Minority groups have neither a statutory nor a constitutional right to proportional representation. *Id.*

11) In remapping the City wards, this court should examine the 15th, 25th, 22nd, 26th, 30th, 31st, 32nd, 33rd, 35th, 37th and possibly consider the 1st, 7th, and 12th wards.

Within these specific guidelines, the Seventh Circuit noted that a district court in ordering the remap should fashion a remedy "commensurate with the right that has been violated ... The court should exercise its traditional equitable powers to fashion the relief so that it *completely remedies the prior dilution of minority voting strength* and fully provides *equal opportunity for minority citizens to participate and to elect candidates of their choice.*" *Id.* at 1412 (quoting Senate Report at 31) (emphasis added). In light of this direction, we turn to the proceedings in this court.

---

**6.** The election database was updated by redistricting expert Kimball Brace to include election returns, registration, and turnout for the November, 1982 general election, the 1983 primary and general elections, and the 1984 primary and general elections. *Transcript of Proceedings* at 76. (hereinafter "Tr.").

**7.** John P. Daley and Patrick M. Huels were granted intervention from the 11th Ward.

**8.** Frank J. Brady and Frank D. Savickas were granted intervention from the 15th Ward.

**9.** Michael L. Nardulli and Matthew W. Biesczat, and Mirta Roman, et al., two groups of intervenors from the 26th Ward, were granted intervention.

**10.** Miguel Santiago and Edward Nedza were granted intervention from the 31st Ward.

## Proceedings on Remand

On July 2, 1985 this court ordered all parties to "obtain, collect, consider, analyze, and evaluate data, statistical and otherwise," to comply with the Seventh Circuit's mandate that this court consider "recent historical trends and patterns," if any, in determining an effective majority and the need for a corrective. The court was informed through the affidavit of redistricting expert, Kimball Brace, who testified at the original trial, that updating the data base, which contained population and voting age population figures and breakdowns according to race, would take at least 90 days. The update required consideration of elections following the court-approved map in December, 1982.[6] The court, however, set an expedited schedule for the preparation and exchange of proposed maps and supporting data, and set the matter for trial on November 4, 1985. In the interim, several parties moved for and were granted permissive intervention pursuant to Fed.R.Civ.P. 24(b). Citizens from the 11th,[7] 15th,[8] 26th,[9] and 31st Wards[10] were permitted to intervene. Furthermore, after a hearing on a motion the Corporation Counsel of the City Council was designated as the legal representative for the City Council in this matter.[11] As a result of that ruling 25 individual aldermen of the City Council, (certain intervenors)[12] represented by Mr. William Harte, sought and were granted intervention as defend-

---

**11.** Upon a motion that had been pending for sometime throughout this litigation, this court ruled that the Corporation Counsel was the legal representative of the City Council unless the Council, by a valid legislative act, appointed special counsel to pursue this litigation. No such enactment was presented to the court and the defendant City Council was represented throughout the remand by the Corporation Counsel.

**12.** Twenty-five individual aldermen of the City Council sought and were granted permissive intervention as defendants. During the course of the remand proceedings, two of the twenty-five intervenors subsequently retained separate counsel.

ants. Representing different views in this case, then, were members of the Black (the Ketchum and PACI plaintiffs) and Hispanic (Valasco plaintiffs) communities, as plaintiffs, the City Council as defendants, and certain intervenors (25 aldermen), individual intervenors, (Daley and Huels, Brady & Savickas, Mirta Roman, et al., and Santiago & Nedza), and the Department of Justice, as intervenors.

At the pretrial conference on October 28, 1985 the parties informed the court that they were engaging in settlement negotiations and were close to settlement.[13] On November 4, 1985, the date originally set for a full trial, the court heard evidence from the proponents of the proposed settlement. The settlement primarily concerned the creation of four majority Hispanic wards, and returning the 37th Ward to its pre-1981 map status as a significantly majority Black ward. The hearing was limited solely to the wards North of the Sanitary District Canal and the Stevenson Expressway.

Only a few objectors, intervenors from the 26th Ward, represented by Mr. Richard Troy, came forward. Mr. Troy presented the testimony of two witnesses, both precinct captains, who expressed opposition to the proposed settlement. Additionally, a businessman also testified in opposition to the compromise plan. Both precinct captain witnesses stated that the current configuration of their ward (the 26th) was proper and afforded Hispanics the opportunity to elect representatives of their own choice. On cross-examination, the witnesses stated that the proposed settlement would remove their alderman from their ward and that prospect might result in their removal as ward committeemen.

Mr. Troy submitted an alternative proposal which he believed would afford more Hispanics meaningful representation. This proposed plan did not create another Hispanic ward but sought to increase the percentage of Hispanic voters within the 26th Ward. Following Mr. Troy's presentation, several other parties presented argument in support of the proposed plan.

At the conclusion of the presentation, the court took under advisement approval of the North side of city, pending resolution of the entire map, and the parties again began negotiations with respect to settlement of the ward configurations on the South and Southwest sides of the city. The parties informed the court on November 8, 1985 that a settlement had been reached regarding wards South of the Sanitary District Canal and the Stevenson Expressway. Once again the parties presented argument and evidence in support of the proposed plan. The settlement plan incorporated the agreements on the North side, and thus presented a city-wide settlement plan.

The principal objectors to the agreed plan on the South side were intervenors Brady and Savickas from the 15th Ward, represented by Mr. Sam Ruffolo. Mr. Ruffolo identified several reasons for rejection of the agreed plan. He argued the agreed map was not the most appropriate remedy because 1) it resulted in fracturing of an ethnic community, 2) it removed Mssrs. Brady and Savickas from the 15th Ward; and 3) it created an unnecessary and disproportionate Black majority in the 15th Ward. Alderman Brady testified, as did Mr. Kimball Brace, an expert in redistricting, in support of the objectors' allegations. Mr. Ruffolo presented new alternatives that addressed these alleged failings, and presented statistical and supporting data underlying the proposals. At the close of the evidence the court took the matter under advisement and scheduled a final opportunity for oral argument in support of the map and the proposed settlement alternatives. Following the oral argument on December 4, 1985, the court took the matter under advisement.

13. The settlement negotiations continued throughout the month of November. The resulting settlement concerned the configuration of the wards and not the issue of whether special elections should be held. That issue remains unresolved by this court. All of the plaintiffs and defendants agreed to the settlement as did most of the intervenors. Intervenors from the 26th and 15th Wards are the only objectors to the agreement.

## The Settlement Map

According to the 1980 census, the City of Chicago has a total population of 3,005,072, Non-Hispanic White population of 1,299,557 (43.2%, down from 65.5% in 1970), Black population of 1,197,000 (39.8%, up from 32.7% in 1970), and an Hispanic population of 422,063 (14.0%, up from 7.3% in 1970). The City Council must redistrict the city every 10 years, following a national census. Ill.Rev.Stat. ch. 24, §§ 21–36 & 21–38 (1983). In 1980, the ideal population for each of the 50 aldermanic wards was 60,-101. The city's residential pattern demonstrates that Black and White citizens live in separate, fairly homogeneous, and easily defined areas. The Hispanic community is more dispersed, but is generally concentrated around two areas.

These basic residential patterns impact a redistricting plan in several respects. First, because of the concentration of racial groups, wards with an exceedingly high percentage of only one race are common. Second, this fact also increases the likelihood of fracturing in bordering areas. Third, the geographical demarcation between the groups is sharp, requiring a delicate balance in the configuration of wards that encompass both sides of the racial boundary.[14] Fourth, the compactness requirement in redistricting also makes inevitable the exclusion of some parts of racial groups that may be dispersed. For example, to encompass all Hispanics in a few wards (putting aside that this may result in packing, itself a violation of § 2) would be impractical given the relative dispersion of Hispanics in the city. Thus, while the population of Hispanics in absolute numbers may seem to support a greater number of Hispanic wards, the dispersion of Hispanics makes creation of more than four majority Hispanic wards virtually impossible. Further, this court rejects the concept of proportional representation. Within this resi-

dental pattern framework we now address the specific settlement plan.

## North of the Canal

Almost all of the Hispanics in Chicago live North of the Sanitary District Canal. Thus, it is naturally in this half of the city that we address the Seventh Circuit's identified violations of fracturing in the Hispanic community. The Seventh Circuit found that the Northwest-side Hispanic communities under the 1981 City Council map were divided among six wards (the 26th, 30th, 31st, 32nd, 33rd, and 35th Wards). The Hispanic population percentages varied between 24.1 to 57.3%. The Southwest-side Pilsen community was split into two wards (the 1st with 30.7% and 25th with 52.6%), and the Little Village Community was split between the 12th and 22nd Wards (32% and 64.3% Hispanic respectively). Additionally, statistics have shown that Hispanic communities have fewer members of voting age, and lower registration and lower turnout than the White communities. The practical effect is that there was no ward with an effective Hispanic majority under the City Council map and, not suprisingly, no Hispanic had been elected to the City Council. The court-ordered map required the creation of four majority Hispanic wards and a plurality Hispanic ward. The Seventh Circuit agreed with the district court's analysis that four Hispanic wards was proper, but disagreed as to what constituted an effective majority ward. For example, the creation of majority voting age populations under the court-approved map in Wards 26 and 31 were 56.0% and 50.6%. Given the demonstrated lower voter turnout, the "majority" wards were not majority at all in the sense of providing Hispanics an effective opportunity to elect representatives of their choice.

Under the settlement plan, four substantial total population majority Hispanic wards and less substantial voting age ma-

---

14. For example, the 18th Ward is split almost exactly in half between Black and White citizens. Western Avenue, which divides the Ward in half, marks the dividing boundary between the two communities. The East side of Western is almost entirely Black and the West side of Western is almost entirely White. Any shift to the East or West in the boundaries of the 18th Ward will have a significant impact on the ward's racial composition.

jority wards are created. The 22nd, 25th, 26th and 31st Wards have all increased in total Hispanic population over both the City Council Map and the Court-approved map. Likewise, the V.A.P. percentages have increased greatly over the City Council map and slightly over the Court-approved map. Clearly V.A.P. majorities exist in the 22nd (71.77), 25th (66.74), and the 26th wards (57.69), while the 31st Ward has a lesser majority of (52.35). The 31st Ward, however, is the only ward to have elected an Hispanic Alderman.[15]

Significantly, the compromise map addresses the fracturing of the Hispanic community detailed in the Seventh Circuit's opinion. The relative numbers in the compromise map are:

| Ward | 1970 Map | 1981 City Council Map | 1982 Court Approved Map | 1985 Compromise Map |
|---|---|---|---|---|
| 22 | 62.8 (56.7) | 64.88 (59.88) | 75.55 (69.0) | 78.1 (71.77) |
| 25 | 51.1 (44.9) | 52.56 (46.19) | 65.37 (59.5) | 72.9 (66.74) |
| 26 | 50.7 (41.9) | 52.34 (43.68) | 58.83 (50.0) | 64.2 (57.69) |
| 31 | 53.6 (48.4) | 57.26 (52.41) | 57.37 (50.6) | 59.6 (52.35) |

The Hispanic communities of Little Village and Pilsen were fractured under the City Council and court-approved maps among the 1st, 12th, 22nd, and 25th Wards. These adjoining communities, however, possess sufficient populations to create two compact majority Hispanic wards. The settlement plan creates a 72.9% Hispanic total population in the 25th Ward in Pilsen, and a 78.1% Hispanic population in the 22nd Ward in Little Village.[16] Likewise the West Town/Humboldt Park neighborhood was fractured among the 26th, 30th, 31st, 32nd, 33rd, and 35th Wards, effectively diluting Hispanic voting strength. By redrawing the ward boundaries to contain primarily the West Town/Humboldt Park geographic area, the compromise map creates two majority Hispanic wards in the 26th (64.2% Hispanic total population) and the 31st Ward (59.6% Hispanic total population). The 32nd and 33rd Wards, which neighbor the 26th and 31st Wards to the North and East, retain significant, albeit minority, Hispanic populations (44.8% and 35.9% Hispanic population respectively.) Thus, the compromise map creates four majority Hispanic wards, restores the existing Hispanic communities, and ends the dilution of Hispanic voting strength through fracturing.

The only other counter-proposal to this compromise, offered by Mr. Troy, on behalf of the Mirta Roman, et al., Intervenors, addressed a small section of the Northwest corner of the 1st Ward, which is contiguous to the 27th and 32nd Wards. Specifically, intervenors seek to have Hispanics in certain census tracts[17] divided into two wards

15. Alderman Miguel Santiago, who is an intervenor in this case, resides in the 31st Ward. He was elected under the court-approved map, which had an Hispanic voting age majority of 50.6%. The settlement map has a 52.35% Hispanic voting age majority in the 31st Ward.

The 31st Ward intervenors presented a motion for summary judgment regarding the configuration of the 31st Ward. The argument in support of their motion, simply stated, was that the election of an Hispanic alderman under the existing map was conclusive evidence of "an effective opportunity for Hispanics to elect a representative of their own choice." If a retrogression violation in the 31st Ward were the only issue before the court, this argument might be more persuasive. We did not rule on the motion, however, because it was withdrawn prior to a ruling.

16. The natural result of this remedy has been a decrease of Hispanic voting strength in neighboring wards.

17. The census tracts are 2415, 2420, 2421, 2422, 2430, 2431, 2432, 2433, and 2422, all of which are majority Hispanic, and 2429, which is 45% Hispanic.

(1st and 32nd) rather than three (1st, 27th and 32nd) as is the case in the compromise plan. The ostensible purpose of the revision is to remedy the fracturing of the West Town area. Yet, the proposed plan has virtually no effect on the 32nd Ward, and increases the Hispanic population of the 1st Ward by only 3.72%, while diminishing the Black population percentage in the 1st Ward by 4.84%. While the revision does diminish the Hispanic population in the 27th Ward by 3.51%, (thereby presumably lessening Hispanic fracturing) this is not significant given the overwhelming Black majority in the 27th Ward, which actually increases under the Mirta Roman plan (81.46% to 84.84%).

The evidence offered in support of the revision was the testimony of two precinct captains and an offer of proof of others to the same effect as the captains. Ms. Roman testified that she believed that there was nothing wrong with the 26th Ward configuration prior to the remap, and she now opposed further changes. She stated that her opposition to the compromise plan was not based on her dislike of the current configuration, but rather expressed a preference for the old configuration. Mr. Scharon, also a 26th Ward precinct captain, testified next. His opposition to the compromise plan like Ms. Roman's seemed to be based on the frequency of changes, and not on the specific proposal. Mr. Troy's final witness was Mr. Peoples, a businessman, who objected to the plan because it did not enhance the voting strength of the Blacks in the 1st Ward.

 In sum, Mr. Troy's opposition to the compromise plan is based on the notion that a small percentage of Hispanics re-main outside the 26th and 31st Wards, both of which have Hispanic majorities. But, as he admits, the Hispanic community is more disperse than either the White or Black communities, (See *Mirta Roman Proposed Facts* ¶ 7) and a natural result of this phenomenon is that some Hispanics may not be encompassed within Hispanic majority wards.[18] We should reiterate that nothing in the Voting Rights Act requires that there be proportional representation nor that any minority be guaranteed a certain percentage of the voters in a ward. The Seventh Circuit as well recognized this. Early in these proceedings, this court advised the parties that no plan would be accepted if it involved proportional representation. Mr. Troy argues that the Hispanics who were drawn out of the Hispanic-majority 26th and 31st Wards and into the 1st and 37th Wards should be replaced so that they may be part of an increased majority in an Hispanic ward. The lines, however, must be drawn somewhere, and it is in the nature of a compromise that no one party may satisfy his desires or accomplish his objectives to the fullest extent. Compromise involves mutual concessions. Mr. Troy has not presented any significant or compelling reason to adopt his alternate plan. His evidence has failed to demonstrate that the compromise plan violates the Voting Rights Act. Because we believe that the compromise plan satisfactorily provides Hispanics a reasonable opportunity to elect representatives of their own choice and satisfies both the Seventh Circuit's remand order and the Voting Rights Act, we reject Mr. Troy's alternative proposal.

| | Hispanic Percentages | |
| --- | --- | --- |
| Ward | Compromise Plan | Mirta Roman Plan |
| 1 | 18.83 | 22.55 |
| 27 | 9.47 | 5.96 |
| 32 | 44.76 | 44.83 |

18. For example, the following colloquy took place regarding Mr. Troy's alternate plan between Mr. Harte and Mr. Brace, the redistricting expert:

Mr. Harte: In order to do what Mr. Troy wants to do then, Mr. Brace, you would necessarily have to fragment some other part of a Hispanic community, would you not?

Mr. Brace: That is correct.

. . . .

Q. So whichever way you move these two lines [bordering the 27th Ward] with respect to these two wards, you are going to fragment some of the Hispanic community, is that right?

The only other ward lying North of the Canal which the Seventh Circuit directed this court to address is the 37th. However, because it considered the 37th and 15th Wards together, as part of the same violation, we do the same. In both the 37th and 15th Wards, the City Council map, through boundary manipulation and fracturing, created White majority wards where there should have been substantial Black majority wards. The Court-approved map created slight (52.6) and moderate (56.2) voting age majorities in the 15th and 37th Wards respectively. In its clearest direction, the Seventh Circuit ordered this fracturing be corrected with the target percentages being the 1980 population under 1970 map figures. While the pre-redistricting numbers need not be reached precisely, the Seventh Circuit ordered this court to assess the new figures for these wards, justifying changes in percentages, if necessary, *downward* from the pre-City Council map. *Ketchum*, 740 F.2d at 1414. The numbers in the compromise map are as follows:

| Ward | 1970 Map | 1981 City Council Map | 1982 Court Approved Map | 1985 Compromise Map |
|---|---|---|---|---|
| 15 | 66.36 (59.99) | 41.69 (34.59) | 60.09 (52.6) | 74.5 (68.0) |
| 37 | 76.39 (72.42) | 36.84 (31.21) | 61.65 (56.2) | 80.4 (77.6) |

The compromise map percentages clearly *exceed* the 1970 levels, fully complying with the Seventh Circuit's requirements. Equally significant was the evidence on Black fracturing. The plaintiffs produced a statistical expert who examined the degree of relative fracturing between Blacks and Whites. His conclusion was that the compromise plan treats Blacks and Whites "essentially equally."[19] (Tr. at 219). Thus, the compromise plan restores the substantial Black majorities in the 37th and 15th Wards.

### South of the Canal

The only violation identified in the wards South of the Sanitary District Canal was the fracturing of the Black community in the wards that encompass the border of the White and Black communities. The Seventh Circuit ordered the violation in the 15th Ward (discussed above) be corrected and urged this court to give further consideration to the 18th and 7th Wards.

The compromise plan creates an effective Black majority in the 15th Ward. The Black majority 15th Ward, as has previously been noted, exceeds the 1970 percentages (74.5% T.P., 68% V.A.P.). Indeed, the principal objector to the configuration of the 15th Ward questions whether the percentages are not in fact too high (a contention we address later). We note however, that the Seventh Circuit viewed "restoration of the pre-redistricting black majorities . . . [to 66%] as a fair antidote to retrogression." *Ketchum*, 740 F.2d at 1416. Furthermore, the existence of an effective Black majority in the 15th Ward is perhaps the fairest way of remedying the city-wide retrogression, a concept with which all parties except the present alderman and ward committeeman agree.

In 1980, under the 1970 map, there were 19 Black majority wards. The Council's

A. Yes, generally because of the Hispanic community being so dispersed. *Transcript of Proceedings* at 128–29.

19. The plaintiffs produced statistical evidence which demonstrated that the probabilities of a Black being placed in a majority White ward was only slightly higher than the probability of a White being place in a majority Black ward. *See* Pltf's Ex. 543. This evidence shows the degree to which fracturing of individual voters is more prevalent in one race than the other, suggesting a dilution in voting strength. The inference drawn from the statistics is that the fracturing of Black voters is remedied under the compromise plan. This close correlation is finally achieved by creating a total population majority Black Ward in the 18th Ward. (See Tr. at 225–227).

1981 map had only 17 Black Wards. The district court concluded that a Section 2 retrogression violation had occurred. It ordered the restoration of the two majority Black wards in the 15th and 37th Wards, but settled on a 52.6% and 61.65% V.A.P. Black majority respectively as a restoration. The Seventh Circuit found this correction insufficient. In the compromise map, Black voting age percentages for the two wards (15th Ward—68%, 37th Ward—77.6%) create a fair opportunity for Blacks to elect representatives of their choice. The compromise map also addresses the fracturing of Blacks on the South side, and corrects the retrogression city-wide.

Plaintiffs had asked the court of appeals to restore the pre-redistricting percentages not only in the 15th and 37th Wards but also in the 7th Ward and the Black plurality in the 18th Ward. The court of appeals declined generally to adopt a uniform remedy for retrogression within individual wards. As the Court stated, "there is no vested right of a minority group to a majority of a particular magnitude unrelated to the provision of a reasonable opportunity to elect a representative under *well recognized principles." Ketchum*, 740 F.2d at 1418. Moreover, the court of appeals left to the district court on remand in the exercise of its discretion, to fashion "the precise remedy [and] the precise configuration of particular wards." *Ketchum*, 740 F.2d at 1398.

None of the parties believes it necessary to alter the percentage breakdowns or the configuration of the 7th Ward. Under the compromise map, Blacks have a 58.03%

V.A.P. majority, while Whites comprise 14.72%, and Hispanics comprise 26.55% of the total. The court of appeals was concerned with the 58% figure because the pre-redistricting Black majority under the 1970 map was 63.1%. We do not believe that restoration of that percentage is necessary to afford Blacks a realistic opportunity to elect members of their own choice for a number of reasons. First, the Black percentage of total population is 58.4% and the total Black V.A.P. is 58.0%. This closeness in percentage of total population to V.A.P. with respect to Whites and Hispanics is also present.[20] This demonstrates that the proportion of non-voting persons to those of voting age among the three groups is analogous. Indeed, in the 7th Ward, unlike other wards[21] the proportion of voting age to non-voting age citizens is closest among Blacks. Consequently, there is no need to account for a younger population in the 7th Ward. In essence, because voting age statistics are used, there is no need for a 5% corrective to account for younger citizens. Finally, the Blacks' percentage is twice that of Hispanics and thrice that of Whites. Even if Whites and Hispanics were joined, the Black majority would still exceed 15%. In light of these factors, and others[22], we agree with the parties that the 58% Black majority in the 7th Ward is sufficient to create an effective Black majority.

Finally, the 18th Ward creates a Black majority in total population and White majority in voting age population. The percentage breakdowns are as follows:

**20.** The breakdown is as follows:

| | Total Population | Voting Age Population |
|---|---|---|
| Hispanic | 30.09 | 26.55 |
| Whites | 11.33 | 14.72 |
| Blacks | 58.4 | 58.0 |

The increase in voting age population among Whites (up 3.39% from total population) comes largely at the expense of Hispanics (down 3.54% from total population). The Black majority is virtually unaffected.

**21.** For example, in the 22nd Ward, Whites account for 16.57% of the total population, while

they account for 22.56% of the voting age population, a difference of 6%. Likewise, while the ward is predominately Hispanic in total population (78.11%), the percentage of voting age population decreases to 71.77%. This decrease reflects the younger, non-voting age Hispanic community in the 22nd Ward. That disparity simply does not exist in the 7th Ward among Black voters. What disparity there is affects the relative minority positions of White and Hispanics and not Blacks.

**22.** We note that the 7th Ward has elected a Black alderman (Alderman Beavers).

| Ward | Black | White |
|------|-------|-------|
| 18 | 51.44 (46.6) | 48.32 (50.03) |

Unlike in the 7th Ward, where the Hispanics are a sizeable group, the Hispanic voting age population in the 18th Ward amounts to less than 1% of the total. Thus, Hispanics are not a factor in the equation in the 18th Ward. Initially we note that the White voting age majority for all practical purposes is non-existent. If the common definition of a majority is used (50% + 1) then the Whites have a majority by .03%. The Whites do have, however, a 3.3% advantage over Blacks in the V.A.P. figures. Blacks have approximately the same percentage advantage over Whites in total population (3.1%). Thus, this ward is, as one of the attorneys for the defendant-intervenors identified it, "a horserace."

There is no established need to create a Black majority ward of the kind found in the 15th Ward or 37th Ward for a number of reasons. First, the Black population of the 18th Ward in 1980 under the 1970 map was at 49.3%. Thus, the retrogression within the ward under the City-Council map was not of the magnitude that was found in the 37th and 15th Wards. Further, the Black population in the 18th Ward in 1980 under the 1970 map had not achieved a majority, and thus retrogression was not from a majority ward (or even a plurality ward) to a minority ward, but from a greater minority to a lesser minority. Second, there is no evidence of the kind which existed in the 37th and 15th Wards of a substantial shifting of the Black population to alter the ward's racial composition through boundary manipulation. Third, because there are overall nineteen Black wards not including the 18th Ward, it is unnecessary to create a significant Black majority in the 18th Ward to remedy city-wide retrogression. Finally, as the mathematical statistical evidence on remand demonstrates, the fracturing of Blacks on the South side has been largely eliminated, notwithstanding the lack of a voting age majority Black ward in the 18th Ward. Therefore, we find the 18th Ward configuration, set in the context of the overall remap, adequately redresses the establish violations of § 2 and comports with the guidelines of the Seventh Circuit's remand.

The only objector to the redistricting South of the Canal who offered a proposed amendment was attorney Mr. Sam Ruffolo, on behalf of intervenors from the 15th Ward, incumbent Alderman Brady and Ward Committeeman Savickas. His objections centered on the 15th Ward but necessarily spilled over to the neighboring wards. Mr. Ruffolo objected to the compromise plan's configuration of the 15th Ward on three bases: a) it displaced Alderman Brady from within the boundaries of the ward, thereby depriving the members of the ward of their elected Alderman; b) it fractured a highly visible community between the 15th and 13th Wards; and c) the statistical evidence of recent voting patterns and trends demonstrates there is no practical need for a supermajority in the 15th Ward.

■ Objector Ruffolo's first two contentions are easily disposed of. First, the preservation of incumbency is not a valid objection to a redistricting plan, particularly so when the incumbency may be the product of a racially discriminatory redistricting plan in the first instance. *Ketchum*, 740 F.2d at 1408. Second, communities of interest may properly be split in order to rectify proved dilution of minority voting strength. *United Jewish Organizations v. Carey*, 430 U.S. 144, 172, 97 S.Ct. 996, 1013, 51 L.Ed.2d 229 (1977). The intervenors' third contention merits closer consideration.

The 15th Ward intervenors claim that the current configuration is sufficient to afford Blacks an opportunity to elect a representative of their own choice, and there is simply no need to create the type of majority contemplated by the compromise map. Mr. Ruffolo submitted two alternative proposals, Ruffolo A and B, as more appropriately affording Blacks an opportunity to elect representatives of their own choice. In support of his alternatives, Mr. Ruffolo presented the evidence of Alderman Brady and Mr. Brace. The evidence demonstrated that the Blacks in the 15th Ward had an

effective majority under the compromise plan, Ruffolo A, and Ruffolo B. The figures are as follows:

| Ward | Compromise Plan | Ruffolo A | Ruffolo B |
|------|-----------------|-----------|-----------|
| 15 | 74.29 (67.87) | 60.22 (52.72) | 66.58 (59.0) |

The 18th Ward, which borders the 15th to the South, is unaffected by either alternative. This is surprising because one would expect any alternative designed to increase Black voting strength in the South side would attempt to increase Black voting strength in the ward where it could have the most impact—the 18th Ward which has a slight total population majority. Yet neither alternative increases Black voting strength in the 18th Ward.

The figures in the 15th Ward encompass recent elections. On cross-examination, Mr. Brace testified that in aldermanic elections, which is the basis for this remap, turnout is lower than in other elections. (Tr. at 106.)[23] This fact would virtually destroy the 52% majority proposed under Ruffolo A, and, in itself, is a sufficient basis to reject that alternative. But there are other reasons as well.

■ First, in its opinion, the Seventh Circuit was most direct about the proper remedy for the 15th and 37th Wards. *Ketchum*, 740 F.2d at 1417. It found the creation of a greater majority in these wards a "fair antidote" to retrogression because these wards had achieved significant majorities before they were turned into white majority wards under the 1981 City-council map. We simply do not feel

that 51% and 59% majorities fairly remedy the retrogression and boundary manipulation effected in the 15th Ward. Second, the 15th Ward intervenors did not convincingly demonstrate that "recent historical trends" obviated the need for any corrective.[24] Third, the 15th Ward may not be viewed in isolation when there is evidence of fracturing in the Black community throughout the South side. It may be that the need for a greater majority in the 15th Ward is essential to remedy the fracturing of Blacks in the South side. Certainly, increasing the Black percentages in the predominantly White (74.15%) 14th Ward from .53% in the compromise plan to 6.90 and 6.91% under Ruffolo A and B, does very little to remedy Black fracturing. Finally, the evidence does not and cannot demonstrate that the compromise plan violates either § 2 of the Voting Rights Act or the Seventh Circuit's remand order. As we have shown, the configuration of the 15th Ward under the compromise plan satisfies section 2's requirements. Even if we were to find either Ruffolo A or B also satisfies section 2, we would hesitate to disturb a plan which fully complied with the Voting Rights Act and which has engendered the support of all the plaintiffs, the Corporation Counsel, the Department of Justice, certain individual aldermen intervenors, and all other intervenors, with the exception of two, in order to adopt at most an equally acceptable plan.[25] Therefore, we reject both Ruffolo A and B.

**23.** The average turnout in the Black communities East of Western Avenue on election day on the South side is slightly over 50%. (Tr. at 105.) The lowest turnouts, however, were recorded during the two aldermanic elections held during the data base period. *Id.* at 106.

**24.** Because the proposed configurations of the wards are the product of compromise, scant evidence was produced on the historical trends in recent elections. The database was updated, however, to account for recent elections, *see supra* note 6, and some evidence taken, and presumably the trends were considered by the parties.

**25.** It is distinctly the task of the City Council to redistrict the City. Plaintiffs have urged this

court to accord the compromise plan "great deference" on account of it garnishing the collective support of 45 of the 50 aldermen in the Council through their positions as either plaintiffs or intervenors in the case. *See McDaniel v. Sanchez*, 452 U.S. 130, 138–40, 101 S.Ct. 2224, 2230–31, 68 L.Ed.2d 724 (1981). The objectors have opposed such deference because the City Council has not acted as a body to approve this map. Indeed, they point out the immediate precursor to this plan was approved by a majority of the counsel and vetoed by the Mayor.

Both parties, however, miss the point. The compromise plan gains its persuasiveness and weight not because it has been granted legislative grace. The day for that has long past. The compromise plan is influential because it represents a plan that virtually every party can agree

*Conclusion*

■ Because the compromise plan effectively remedies the established violation of section 2 of the Voting Rights Act in accordance with both the Voting Rights Act and the Seventh Circuit's remand order, this court approves the compromise plan designated as C–3.[26]

IT IS SO ORDERED.

## ON MOTION FOR SPECIAL ELECTIONS

Twenty years ago, in reviewing a voting rights lawsuit brought on behalf of black citizens, the Supreme Court set forth the responsibility of federal courts called upon to remedy violations of the voting rights of racial minorities. The Court noted that

> [a] court has not merely the power but the duty to render a decree which *will so far as possible eliminate the discriminatory effects of the past* as well as bar like discrimination in the future.

*Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (emphasis added.) This standard remains the law today. *See also McDaniel v. Sanchez*, 452 U.S. 130, 137, 139, 101 S.Ct. 2224, 2229, 2230, 68 L.Ed.2d 724 (1981).

In ordering this court to redress violations of section 2 of the Voting Rights Act, the Seventh Circuit quoted this statement and noted that federal courts must meet an "exacting standard … 'free from any taint of arbitrariness or discrimination,'" *Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir.1984) (quoting *Connor v. Finch*, 431

U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977), in approving redistricting plans. We must be satisfied that the vestiges of past discrimination have been eliminated, and we must be assured that the door to future discrimination has been barred. To a large extent, the reconfiguration of the City's wards approved by this court just the other day centers on preventing only future discrimination. This court's attention now must focus on the immediate effects of the earlier faulty remap and the lingering impact that map has (in the form of past discrimination) on the electoral process and the affairs of city government today. We turn to the plaintiffs' motion for special elections.

The Ketchum and Velasco plaintiffs filed their motion to order special elections in the seven wards redrawn in the Settlement Plan remedying the City Council's violations of the Voting Rights Act. Plaintiffs' motion was joined by the PACI plaintiffs, the Corporation Counsel, and the United States Department of Justice. In addition, this Court granted *amicus curiae* status to the League of Women Voters and the Better Government Association, which also support plaintiffs' request for special elections. Objections to the motion for special elections have been filed by the intervenor-defendants, represented by William J. Harte ("Certain Intervenors"), the Mirta Roman intervenor-defendants, and the Santiago-Nedza intervenor-defendants [collectively, the "objectors"].

to. Plaintiffs, who have continued this litigation through the appellate process only in pursuit of an appropriate remedy, and defendants, who have at last agreed to extensive negotiations in the spirit of compromise and reconciliation, have reached a solution, with the guidance of the Department of Justice, to the aldermanic redistricting. Each plaintiff group is composed of individual members whose interests, while remaining compatible, are often affected by the slightest changes. Each of the defendant-aldermen are affected even more so by the exact configuration of their own wards and the wards in which aldermen they share alliances with reside.

Against this backdrop the parties have had to satisfy the broad, pervasive requirements of the Voting Rights Act, and the narrow, detailed spe-

cifics of the Seventh Circuit's remand. This court is satisfied that the end product of that hard work does comply with those requirements. That the parties have been able to achieve the goal set for them first by Congress in enacting the Voting Rights Act and then by the Seventh Circuit in its remand order is indeed remarkable. It is only in this vein, that the compromise plan is entitled to the court's respect and consideration.

**26.** The only remaining issue in this case is whether special aldermanic and committeemen elections are necessary in the wards affected by this remand. This issue is fully briefed and the court will rule on plaintiffs' motion by the end of the day on December 30, 1985.

■ The court has in a separate opinion dated December 27, 1985 ordered the remapping of certain wards of the City of Chicago. The order provides a prospective remedy for the fracturing, retrogression, and boundary manipulation committed by the City Council and identified by the Seventh Circuit. *Ketchum,* 740 F.2d at 1406, 1412. This court, however, is charged with the duty of preventing discrimination not only in the future, but also with eliminating the discriminatory effects of the past.

■ It is not seriously challenged that where racial discrimination has affected the conduct of an election, it is the "established power of a Federal Court to extinguish its effects even to the point of setting aside the election." *Bell v. Southwell,* 376 F.2d 659, 662–65 (5th Cir.1967). The power to order special elections should be exercised whenever there is a possibility that the illegal voting practice affected the election's outcome. *Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). We note that in resolving a challenge to the 1970 Chicago City Council redistricting, the district court ordered special elections in the affected wards. *See Cousins v. City Council,* 503 F.2d 912, 914 (7th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 674 (1975).

Federal courts have often ordered special elections to remedy violations of voting rights. Prospective relief alone is "of little consequence to the many voters who sought to vote ... and could not do so effectively." *See Coalition for Education in District One v. Board of Elections,* 370 F.Supp. 42, 58 (S.D.N.Y.), *aff'd,* 495 F.2d 1090 (2d Cir.1974). Particularly where "voters are represented by unconstitutionally elected officials ... [courts have] had no difficulty in determining that the terms of the officials elected" should be shortened and special elections held. *See Tucker v. Burford,* 603 F.Supp. 276, 279 (N.D. Miss.1985) (redistricting case).

For this court to impose special elections, the plaintiffs must demonstrate that 1) there has been a serious and substantial violation of minorities' voting rights; 2) there is a "reasonable possibility" that the violation affected the outcome of the challenged elections; and 3) plaintiffs exercised due diligence in seeking relief in advance of the challenged election. *Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

It is not contested that plaintiffs have diligently sought relief prior to the challenged election. There is no evidence nor even any suggestion that plaintiffs "deliberate[ly] bypass[ed]" pre-election relief in order to contest a later possible election defeat. *Toney v. White,* 488 F.2d 310, 315 (5th Cir.1973) (*en banc*). Plaintiffs filed suit in 1982, long before the challenged elections in 1983 and 1984. Plaintiffs have also sought diligently and expeditiously to pursue this litigation through the appellate process and on remand. They have clearly satisfied the due diligence requirement.

There is also no serious challenge that the dilution of minority voting strength possibly affected the outcome in the aldermanic and committeemen elections in the seven wards. Where there are findings of racial discrimination, this may not even be a requirement. *See Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967). Whether this latter requirement has been satisfied is often a function of the first requirement. If a violation was insubstantial, it is unlikely that it would have had an effect on the outcome of an election (it would be a meaningless inquiry in any event because the first requirement would not be satisfied). If the violation was substantial and serious, it is likely to have affected the outcome of the election.

The real dispute regarding special elections in this case is over the characterization of the violations. This question is complicated by two factors: the imposition of the court-ordered map in 1982, and the subsequent aldermanic and committeemen elections in 1983 and 1984. The challenged elections were conducted based on the 1982 court-approved map, and it now has become the relevant map. In assessing the seri-

ousness of the violations and the need for special elections, we are concerned with violations of the Voting Rights Act *that continued to exist and were unremedied* by the court-approved map. Violations that existed in the 1981 City Council map that were cured by the court-approved map are no longer relevant to the issue of special elections. With this in mind, we turn to the characterization of the violations.

The Seventh Circuit expressly found that the court-ordered map did not remedy the proved violations of section 2. "[W]e find that the *court-approved map* has not provided an adequate remedy for the Voting Rights Act violation because it does not eliminate, in accordance with well accepted principles of redistricting, *the illegal dilution of minority voting strength* accomplished by the City Council Map." *Ketchum*, 740 F.2d at 1412 (emphasis added). The court went on to identify the particular violations and the reasons why the court-ordered map continued to deprive "minority citizens a reasonable and fair opportunity to elect candidates of their choice." *Id.* To remedy city-wide retrogression the court ordered the redrawing of the 15th and 37th Wards. *Id.* at 1417. To end the fracturing of Hispanic voters, the court required the creation of greater majorities, if necessary, in the 22nd, 25th, 26th, and 31st Wards. This court has approved the compromise plan which increases the Hispanic total and voting age populations in those wards. These Hispanic wards now, *for the first time*, contain "effective majorities" sufficient to provide Hispanics a reasonable opportunity to elect representatives of their own choice. Finally, the Seventh Circuit required that the fracturing on the City's South side be eliminated. *Id.* at 1408–09. It urged this court to examine the 7th, 15th and 18th Wards in relation to South side fracturing. The compromise plan created a significant majority in the 15th Ward, altered the 18th Ward, and left the 7th Ward unchanged. These were the violations that remained in the court-approved map that the settlement map has now remedied.

Defendants' principal objections to the substantiality of the violations are two-fold. First, defendants apparently argue that as a matter of law, special elections should only be ordered where there is a finding of intentional, invidious, or purposeful discrimination. Because the Seventh Circuit made no express finding of intentional discrimination, special elections should not be held. We reject this argument.

In declining to make a formal finding of intentional discrimination, the Seventh Circuit noted that there was no need to do so because "there appears to be no difference in the practical result *or in the available remedy* regardless of how the resulting discrimination is characterized." *Ketchum*, 740 F.2d at 1409–10 nn. 10 & 11. Clearly implicit in this statement is that the equitable relief of special elections remains available to plaintiffs in Voting Rights Act violations. The earlier cases on special elections necessarily concerned purposeful discrimination because that was a requirement to prove a Voting Rights Act violation in the first instance. The 1982 amendments, however, were expressly designed to move to an "effects test" in establishing a Voting Rights Act violation, eliminating any inquiry into purpose. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 208. Nonetheless the Seventh Circuit did note that the ostensible purpose behind the City Council map, preservation of incumbency, was hardly distinguishable "from discrimination borne of pure racial animus." *Ketchum*, 740 F.2d at 1408. Special elections are an appropriate part of the comprehensive remedy in this case notwithstanding the absence of a formal finding of intentional discrimination.

The objectors' other basis for opposing special elections is that the changes made in the remap are too "insignificant" to warrant special elections. They argue that the current map is not the dreaded 1981 City Council map, but the 1982 court-approved

map, and that changes in most wards amount to less than 5% of minority voting strength from the court-approved map.

The percentage changes in the Settlement Map initially appear to be significant in only the 15th, 25th and 37th Wards, as the chart below illustrates:

| Ward | Previous Apportionment | | Court-Approved 1982 Plan | | Proposed 1985 Plan | | Difference | |
|---|---|---|---|---|---|---|---|---|
| 15 | 66.36% | B | 60.09% | B | 74.29% | B | 14.20% | B |
| 18 | 49.30% | B | 46.37% | B | 50.03% | B | 3.66% | B |
| 37 | 76.39% | B | 61.65% | B | 80.45% | B | 18.80% | B |
| 22 | 62.81% | H | 75.55% | H | 78.11% | H | 2.56% | H |
| 25 | 51.10% | H | 65.37% | H | 72.95% | H | 7.58% | H |
| 26 | 50.66% | H | 58.33% | H | 64.20% | H | 5.37% | H |
| 31 | 53.61% | H | 57.38% | H | 59.59% | H | 2.21% | H |

However, the changes in the redrawn wards are most significant because they create "effective majorities," regardless of the percentage increase in the minority populations. The Seventh Circuit has already held that the residents of the redrawn wards did not have a fair and equal opportunity under the court-approved map to elect candidates of their choice. *Ketchum*, 740 F.2d at 1412. In discussing a remedy, the Seventh Circuit specifically noted the tremendous difference even a few percentage points could make. *Id.* at 1413–17. The difference between the current map and the Settlement Plan, even if it amounts to only a few percentage points, is the difference between illegal vote dilution and an effective opportunity for Blacks and Hispanics to participate fairly in the electoral process.

Further, approximately 420,000 voters of the redrawn 15th, 18th, 22nd, 25th, 26th, 31st, and 37th Wards have yet to have a fair opportunity to elect candidates of their choice in municipal elections. In quantitative terms, the proposed settlement makes significant changes in the distribution of Chicago's residents. For example, the Settlement Plan increases the Hispanic population of the 31st Ward by 2.21%. The Santiago-Nedza objectors argue that this change does not necessitate special elections. However, the change in Hispanic population grossly understates the massive numerical shifts in population represented by the Settlement Plan. The Settlement Plan numerically moves at least 9,484 former residents of the 31st Ward into other wards, and moves at least 10,922 residents of other wards into the 31st Ward. The total number of old residents moved out and new residents moved in exceeds 34% of the ward's population under the Settlement Plan. The changes in other wards are likewise significant. Literally, of course, it is the wards' boundaries and not citizens that are moved.

These changes are summarized in the following table:

| Ward | Residents Moved In | Residents Moved Out | Total Changed | As a % of New Ward Pop. |
|---|---|---|---|---|
| 15 | 13,163 | 12,003 | 25,166 | 40.88% |
| 18 | 2,742 | 1,699 | 4,441 | 7.32 |
| 37 | 19,533 | 19,180 | 38,713 | 63.50 |
| 22 | 3,110 | 2,905 | 6,015 | 10.06 |
| 25 | 11,972 | 11,833 | 23,805 | 39.63 |
| 26 | 31,130 | 31,460 | 62,590 | 103.22 |
| 31 | 10,922 | 9,484 | 20,406 | 34.53 |

That the changes are from the 1982 court-approved map and not the 1981 City Council map, is not a sufficient basis for denying special elections. *See Hadnott v. Amos*, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Hamer v. Campbell*, 358 F.2d 215 (5th Cir.), *cert. denied*, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); *Cousins v. City Council*, 503 F.2d 912, 914 (7th Cir.1974). The simple fact is the earlier court-approved map was found insufficient by the Seventh Circuit. The violations arising out of the 1981 City Council map continued to the court-approved map, and they continue today. The mere fact that the 1982 map was approved by a federal court does not render the violations non-existent. If it did, the appellate court would not have remanded the case with explicit instructions on a new configuration, and the proceedings on remand would not have been necessary.

In addition to these reasons, other equitable considerations favor the ordering of special elections. First, four wards (the 15th, 37th, 25th, and 26th), no longer have resident, incumbent aldermen. Two wards (the 26th and 37th) no longer have resident, incumbent ward committeemen. The residents of these wards are entitled to representatives who reside within their newly-configured wards. Second, in the seven affected wards the elected officials, at the very least, have been tainted by the unlawful council map of 1981 and its 1982 progeny.

Finally, there will be little inconvenience in scheduling a special election. Statewide elections are already scheduled for March 18, 1986, and will be conducted in every ward and election precinct in the City of Chicago. Plaintiffs have proposed special elections in conjunction with these statewide elections. Chicago aldermanic elections are nonpartisan, and if a candidate fails to receive a majority of the votes cast, state law requires a runoff election. Ill. Rev.Stat. ch. 24, §§ 21–16 to 21–24 (1983). If necessary, runoff elections could be held on April 29, 1986. Aldermanic elections in the proposed seven wards, therefore, can be accommodated with little inconvenience.

Thus, legal and equitable considerations in this case support special elections. No party contests that residents of the seven affected wards have been deprived of an equal opportunity to participate in aldermanic and committeemen elections. This court has both the power and the duty to redress this proved discrimination. Plaintiffs correctly note that they have travelled this litigation path, first to the district court, then to the court of appeals, then to the United States Supreme Court, and back again to this court, in pursuit of a complete remedy to established violations of the Voting Rights Act. There has been no fair aldermanic or committeemen election in these seven wards since the City Council remapped the City in 1981. This court is in a position to restore minority voters to a position they would have rightfully achieved in 1981, absent proved discrimination. The settlement plan steels against future discrimination. As the plaintiffs have waited four years for a comprehensive remedy, so have all of the voters of the City of Chicago. This court has a choice of acquiescing in delay or moving expeditiously. Aware of the singular importance of the right to vote in a republic and the deleterious consequences to a democracy that arise whenever racial discrimination is permitted to dilute and distort the voting strength of any group, we choose to act today. The plaintiffs' motion for special elections is granted.

### Conclusion

Special aldermanic and ward committeemen elections are to be held on March 18, 1986 in accordance with the ordinary election rules and regulations set by the Board of Elections regarding the conduct of elections in the following newly-configured wards: the 15th, 18th, 22nd, 25th, 26th, 31st, and 37th. This court retains jurisdiction over the parties pending implementation and enforcement of this order.

IT IS SO ORDERED.